## Case No. 7,606.

**KANAWHA COAL CO. v. KANAWHA & O. COAL CO.**

[7 Blatchf. 391; 5 Am. Law Rev. 184.] [1]

Circuit Court, S. D. New York. June 24, 1870.

POWER OF SALE—DEED OF TRUST—INCORPORATION—NON USER—WAR OF THE REBELLION—UNLAWFUL INTERCOURSE—COMPENSATION FOR IMPROVEMENTS ON LAND UNDER SUPPOSITION OF OWNERSHIP.

1. Where both of the parties to a suit in equity affirm a deed, and allege, in their pleadings, that a certain party executed it. who ought to have executed it, but did not, the fact that he did not is immaterial.

2. Defects in the proceedings to incorporate a corporation are cured by the subsequent recognition of the existence of the corporation by the legislature of the state under whose authority it claims to have been incorporated.
[Cited in Koch v. North Ave. Ry. Co., 75 Md. 226, 23 Atl. 464.]

3. In a suit by a corporation. the defendant cannot raise the objection that the corporation had, before the suit was commenced, forfeited its rights by non user.

4. Notwithstanding the erection of the state of West Virginia, a corporation previously cre-

---

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission. 5 Am. Law Rev. 184, contains only a partial report.]

ated by the state of Virginia continued to be a corporation of Virginia, so long as it did not become affirmatively a corporation of West Virginia, by complying with the provisions of the act of the legislature of West Virginia, passed October 26, 1863 (Acts 1863, c. 86).

5. Where the power of sale under a deed of trust of lands in Kanawha county, Virginia, executed October 1st, 1854, was suspended by the injunction of a competent court, issued in November, 1857, and which continued in force until December, 1863: *Held*, that the grantors in the deed of trust were not in default, during that period, in not paying the debt secured by such deed of trust.

6. While war was flagrant between the United States and the so-called Confederate States, such war having broken out before such injunction was dissolved, and the creditor to whom the debt secured by the deed of trust was due having been domiciled and resident in the United States during such war, and the grantors in the deed of trust, who were the real debtors to the creditor, having been domiciled and resident in the so-called Confederate States during such war, proceedings were taken, whereby, during such war, the lands covered by such deed of trust purported to be sold under the power of sale contained therein, and to be purchased at such sale by the creditor: *Held*, that the sale was void.

7. The right to a sale could not exist in favor of the creditor unless there existed at the same time a corresponding duty and capacity on the part of the debtors to pay the debt to the creditor.

8. The late war between the so-called Confederate States and the United States was a public war, and a war not only between the respective governments, but between all the inhabitants of the one territory on one side, and all the inhabitants of the other territory on the other side, so that all the people of each must be regarded as having been enemies of all the people of the other, during the continuance of the war.

9. The payment, in this case, of the debt by the debtors to the creditor during the war, would have been business and commercial intercourse, and, therefore, unlawful, under the 5th section of the act of July 13, 1861 (12 Stat. 257), and the proclamation of the president, of August 16, 1861. (Id., 1262); and, therefore, the remedy for the recovery of the debt, by a sale of the lands under the trust deed, was suspended during the war.
[Cited in Haymond v. Camden. 22 W. Va. 190; Tracey v. Shumate. Id. 512.]

10. The trust deed in this case having provided that, in case of a sale thereunder, the trustees should give at least sixty days' notice of the time and place of sale, such notice, when given, was, so far as it was intended to notify the debtors, unlawful intercourse, under said act and proclamation, the persons who acted as trustees in publishing the notice having been domiciled at the time in the territory of the enemies of the debtors.

11. The war suspended not only the right of the creditor to resort to proceedings to enforce the contract, but also his right to procure from a judge in the United States the appointment of a person as trustee under the deed of trust, in place of one of the trustees named therein, who was still living, and the right of the persons assuming to act as trustees to lay the foundation for exercising the power of sale, by giving the notice of sale.
[Cited in Brooke v. Filer. 35 Ind. 408.]

12. The sale having been unlawful, the creditor, who purchased the lands on the sale, and his grantees, acquired no title to them as

against the debtors and their grantees of the equity of redemption, and the right of the latter to redeem the lands from the lien of the trust deed, by paying the debt, remains, and they can enforce such right by a suit in equity in their own names against the grantees of the creditor.
[Cited in Allen v. Allen, 95 Cal. 184, 30 Pac. 215.]

13. Such grantees of the creditor, although their title to the land fails, possess all the rights of the creditor under the deed of trust, and in and to the debt secured thereby.
[Cited in Johnson v. Sandhoff, 30 Minn. 201, 14 N. W. 891.]

14. The fact that the lands lie in the state of West Virginia does not deprive this court of jurisdiction of such suit.

15. Neither the creditor nor the grantors in the deed of trust, nor the trustees named therein, nor the substituted trustee, are necessary parties to such suit.

16. The plaintiffs having taken title to the lands by deeds recorded in Kanawha county in 1856, and the grantors to them, who were the grantors in the deed of trust and the real debtors, having instituted legal proceedings in 1857 and thereafter, against the creditor and others, in respect to the title to such lands, to which proceedings the plaintiffs were not parties, the plaintiffs were not bound by such proceedings.

17. The defendants *held* to have purchased the lands from the creditor with notice of the claim of the plaintiffs thereto, and of their equity of redemption therein.

18. The law stated in respect to making compensation for improvements on land to an innocent person who has made such improvements supposing himself to be the absolute owner of it.

19. Form of the decree in this case.

This was a bill in equity, filed by the Kanawha Coal Company, a corporation created by the state of Virginia, against the Kanawha and Ohio Coal Company, a corporation created by the state of New York. William H. Edwards, alleged in the bill to be a citizen of the state of New York, was named as a defendant in the bill, but, on the hearing, the plaintiff applied to the court for leave to strike him out as a defendant and to dismiss the bill in respect to him, which application was granted. The substantial prayer of the bill was, that the plaintiffs might be let in to redeem certain tracts of land, now situated in the state of West Virginia, which were alleged to be subject to a deed of trust, in the nature of a mortgage, in which the defendants were the sole beneficiaries equitably interested as cestuis que trustent.

On the 1st of October, 1854, William H. Edwards and his wife conveyed by deed to Samuel S. Thompson, Robert H. Maury, Philip P. Dandridge and Robert M. T. Hunter, described in the deed as "all of Virginia." four several tracts of land in Kanawha county, Virginia, with the covenants of general warranty by the grantors. This deed was recorded in the Kanawha county court clerk's office on the 12th of February, 1855. On the 1st of October, 1854, Thompson, Maury and Hunter (without Dandridge) conveyed the same tracts of land by deed to James F. Hansford and Isaac N. Smith, trustees, "in

trust to secure to the said William H. Edwards the payment of the following described bonds, executed to the said Edwards by the said Thompson, Maury, Dandridge and Hunter, and all bearing even date with this deed, to wit: one for the sum of five thousand dollars, payable on the first day of January, 1855; one for four thousand dollars, payable on the 1st October, 1855; one for thirty-five hundred dollars, payable on the 1st day of October, 1856; another for thirty-five hundred dollars, payable on the 1st day of October, 1857; one for six thousand dollars, payable on the 1st day of October, 1858; and the last for twelve thousand dollars, payable on the first day of October, 1859, all payable at the Bank of Virginia, in the city of Richmond, and each bearing interest from the 1st day of October, 1854, the day of their date, said interest payable annually; and, in case any sale of the lands herein conveyed shall be made by the said trustees, James F. Hansford and Isaac N. Smith, they shall give at least sixty days' notice of the time and place of such sale." This deed was recorded in the Kanawha county court clerk's office on the 14th of February, 1855.

Under an act passed by the general assembly of the state of Virginia, March 3, 1854 (Acts Assem. 1853–54, c. 46), entitled "An act to provide for the organization of companies for mining and manufacturing purposes," the plaintiffs became, on the 14th of December, 1855, a body politic and corporate by the name of "The Kanawha Coal Company." By the act, the duration of the corporation was to be for twenty years from the 14th of December, 1855, and it could not hold at any one time a greater quantity of land than three thousand acres. It was incorporated as a company for the purpose of mining for coal, iron and salt, manufacturing iron and making salt, and selling and transporting to market such coal, salt, iron ore and manufactured iron, and its manufacturing and mining operations were to be carried on in Kanawha county, Virginia. On the 17th of March, 1856, an act was passed by the general assembly of Virginia (Acts Assem. 1855–56, c. 383), authorizing the corporation to acquire and hold any quantity of land not exceeding fifteen thousand acres, in the county of Kanawha. On the 1st of March, 1858, an act was passed by the general assembly of Virginia (Acts Assem. 1857–58, c. 387) extending and continuing the corporate rights and privileges of the corporation for the term of fifty years, and enacting that a suspension of operations by the corporation at any time should not operate as a forfeiture of its corporate rights and privileges, unless such suspension should continue for more than ten years at a time.

On the 1st of January, 1856, by a deed of that date, containing a covenant of general warranty, Thompson and his wife, Maury and his wife, Hunter and his wife and Dandridge, conveyed to the plaintiffs three of the four tracts of land conveyed to Thompson, Maury,

Dandridge and Hunter by Edwards and his wife. That deed was recorded in the Kanawha county clerk's office on the 8th of March, 1856. On the 1st of January, 1856, by a deed of of that date, containing a covenant of general warranty, Thompson and his wife, Maury and his wife, Hunter and his wife and Dandridge, and other persons, conveyed to Richard H. Coleman, Charles Morris and Lewis M. Coleman, the remaining one of the said four tracts of land, with other real estate, in trust for certain objects and purposes in said deed mentioned, and with power to the trustees to convey any or all of the tracts of land to whomsoever they should be required and directed in writing to convey the same by a majority in interest of the parties interested in the lands. That deed was recorded in the Kanawha county court clerk's office on the 8th of March, 1856. On the 5th of July, 1856, by a deed of that date, containing a covenant of special warranty, Richard H. Coleman, Charles Morris and Lewis W. Coleman conveyed to the plaintiffs the tracts of land conveyed to such grantors by the said deed of January 1st, 1856. The deed of July 5th, 1856, stated on its face that it was made in pursuance of the instruction and request of more than a majority in interest of the parties then interested in said property, and was recorded in the Kanawha county court clerk's office on the 4th of September, 1856. The tract of land referred to as the remaining one of the four tracts contained between nine and ten thousand acres of land, while the other three tracts contained together less than three thousand acres. Hence the arrangement was made whereby the fourth tract and the other land conveyed to Coleman, Morris and Coleman were placed in trust until after the act allowing the corporation to hold land to the amount of fifteen thousand acres was passed. The land thus conveyed to the plaintiffs did not exceed fifteen thousand acres. The plaintiffs began to carry on the business of mining and manufacturing on the four tracts of land, but they had not worked any mine thereon since 1858, although they had possession thereof up to 1861. The payments which, under the deed of trust from Thompson and others to Hansford and Smith, became due to Edwards prior to the 1st of October, 1857, were regularly paid. Before that date the plaintiffs, believing that they had discovered a defect in the title to a portion of the lands so conveyed by Edwards, gave notice to Thompson, Maury, Dandridge and Hunter of the existence of such defect. They thereupon refused to make any further payments to Edwards until the title to all the land which Edwards had conveyed to them should be made good. Hansford and Smith, the trustees, thereupon, by the direction of Edwards, gave public notice by advertisement, on the 20th of October, 1857, that they would, on the 21st of December, 1857, sell at public auction so much of the land conveyed to them in trust as should be necessary by reason of

the default in making the payment of $3,-500 due on the 1st of October, 1857, by the terms of the trust deed.

On the 10th of November, 1857, Thompson, Dandridge, Hunter and Maury, as plaintiffs, filed a bill in equity in the circuit court for Kanawha county, Virginia, against Edwards and his wife, and the two trustees, and eleven other persons, as defendants. The bill set forth the deed from Edwards and wife to Thompson and others, and the deed of trust by the latter, and averred that Edwards, in conveying by his deed the tract of land before referred to as containing between nine and ten thousand acres of land, conveyed it as containing, "exclusive of the claims of other parties," 9,119 acres, and represented that such claims were claims to only 122 acres, and that he had a good title to the 9,119 acres; that, since making their payment of the instalment of money that fell due October 1st, 1856, they, Thompson and others, had ascertained that Edwards had not a good title to the 9,119 acres; that more than one-third of the same was then claimed and actually held by persons other than Edwards; that the eleven defendants referred to were either living on and claimed to own, or else claimed, portions of the 9,119 acres, amounting in the aggregate to more than one-third of the same, and had been in actual possession of and exercised for a number of years constant and habitual acts of ownership on and over a large part of the same; that the 9,119 acres abounded in coal, and they were induced to purchase it for its mineral qualities; that the tract would be valuable to them if the title to the entire tract could be perfected; that, if the eleven defendants had a bona fide title to the land claimed by them, the value of the tract would be materially diminished, because the portion so claimed was the best portion of the tract, and was on the necessary route from the back portion of the tract to the Kanawha river; that the possession and occupancy of the portion so claimed would so divide the tract as almost to render the remaining part of the 9,119 acres of no value to them, Thompson and others; that they would not have purchased the said tracts of land if they had known that the title to so large a portion of it was defective; that they had found out the difficulties only within twelve months; and that they were willing to make further payments to Edwards, provided he should make good to them the title to the entire 9,119 acres. The bill prayed that the two trustees might be enjoined from any further proceedings in exposing and offering for sale the land aforesaid, or any part thereof, under and by virtue of the trust deed, until the defective title aforesaid should be made clear and perfect, and that Edwards might be enjoined from proceeding at law to collect the unpaid bond due October 1st, 1857. This bill was verified by Thompson, and,

on its being filed, the circuit court of Kanawha county, on the 10th of November, 1857, awarded an injunction restraining the two trusteees from exposing and offering for sale the tracts of land mentioned and described in the bill, or any part thereof, under and by virtue of the deed of trust, until the further order of the court. Edwards, on the 2d of December, 1857, filed his answer to the bill, praying that the injunction might be dissolved, and gave notice that at a future day he would move the court to dissolve the injunction. The trustees put in no answer to the bill, but seven of the other eleven defendants answered it. On the 20th of October, 1858, a supplemental bill was filed by Thompson and others, in the same court, against Edwards, reciting the filing of the original bill and the granting of the injunction, and setting out that one Green had brought a suit against them and Edwards and others, founded on a claim to the equitable ownership by Green of an undivided part of the land sold by Edwards to them, and praying for a perpetuation of the said injunction. On the 31st of Janaury, 1859, Edwards made a motion to the said circuit court to dissolve the said injunction, which was argued by counsel and considered by the court and was overruled. On the 14th of February, 1859, Thompson and others filed a second supplemental bill, in the same court, against Edwards, and obtained thereon an injunction from said court, restraining Edwards, and all persons acting under his authority, from prosecuting any further, proceedings which he had instituted in New York by way of attachment, to collect the instalments secured by the trust deed, which fell due in October, 1857, and October, 1858. On the 2d of December, 1859, another injunction was granted by the said court, on a third supplemental bill, then filed by Thompson and others, restraining Edwards, and all persons acting under his authority, from prosecuting any further, proceedings which he had instituted in New York by way of attachment, to collect the instalment secured by the trust deed, which fell due in October, 1859. On the 14th of December, 1863, the circuit court of Kanawha county made an order in the suit, reciting that, by virtue of three several deeds, executed to Edwards, and dated severally March 28th, 30th, and 31st, 1863, it appeared to the court, that Edwards had procured in fee the outstanding adverse claims alleged and set out in the bill in the suit, except certain timber privileges, reserved by such deed of March 28th, 1863, and dissolving the injunctions theretofore awarded in the cause, and ordering that, as such timber privileges were so reserved, and were not reserved by the deed from Edwards to Thompson and others, the trustee or trustees who might sell said land for the unpaid portion of the purchase money, should retain the sum of $1,000 and pay the same into court, subject to the order of the court, to

meet the value of the said timber privileges, and appointing a special commissioner to state and report the reasonable value of the said timber privileges. By the three deeds of March, 1863, it appeared that Edwards had instituted ejectment suits against the grantors therein severally, to recover lands claimed and held by them severally. The deeds alleged the lands to be part of the 9,100 acres conveyed by Edwards and wife to Thompson and others. On the 26th of November, 1861, the people inhabiting that portion of Virginia known as West Virginia (embracing the county of Kanawha) assembled in convention at Wheeling and framed for themselves a constitution, with a view of becoming a separate and independent state. At a general election, held on the 3d of May, 1862, in the counties composing such territory, the said constitution was approved and adopted by the qualified voters of the proposed state. The general assembly of Virginia, being the legislature thereof, passed an act on the 13th of May, 1862 (Acts Assem., Ex. Sess., May, 1862, c. 1), giving the consent of the legislature of Virginia to the formation and erection of the state of West Virginia, within the jurisdiction of the state of Virginia, to include certain specified counties (embracing Kanawha county), according to the boundaries and under the provisions set forth in the constitution for the said state of West Virginia, and the schedule thereto annexed, proposed by said convention. By virtue of the provisions of an act of congress, approved December 31st, 1862 (12 Stat. 633), and of a proclamation issued by the president of the United States, on the 20th of April, 1863 (13 Stat. 731), the state of West Virginia became one of the United States from and after the 19th of June, 1863. The first session of the legislature of that state commenced on the 20th of June, 1863.

By the constitution of the state of West Virginia (article 11, § 8), it is provided as follows: "Such parts of the common law and of the laws of the state of Virginia as are in force within the boundaries of the state of West Virginia, when this constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this state until altered or repealed by the legislature. * * * All civil and criminal suits and proceedings pending in the county or circuit courts of the state of Virginia, held within the said boundaries, shall be docketed and thereafter proceeded in before the circuit court of the proper county." On the 30th of January, 1863, an act was passed by the general assembly of the state of Virginia, entitled "An act staying the collection of certain debts" (Acts Assem., Ex. Sess., December, 1862, c. 49). This statute was in force from the 1st of February, 1863, and expired, by its own limitation, on the 1st of January, 1864. So far as it applied to deeds of trust, it provided, that, while the act should remain in force, there should be no

sale under any deed of trust theretofore recorded, without the consent of all the parties thereto; that, in all debts or liabilities accruing before July 26th, 1861, the debtor was required, on the demand of the creditor, to pay the interest due thereon within six months after demand thereof, and, upon failure therein, might be proceeded against, as if the act had never been passed; that, in all cases where a lien had been acquired by any deed of trust, the creditor might proceed against the debtor and enforce the collection of his debt, interest and costs, in the same manner as if the act had never been passed, provided it should be shown, in a manner prescribed, that the debtor intended to remove or had removed his effects out of the county where the deed of trust was recorded, or that he was fraudulently removing or disposing of the same, so that they would not be forthcoming and liable to the payment of the deed of trust, at the expiration of the act; that the act should not apply to deeds of trust executed after July 26th, 1861, but sales under the same might be enforced and proceeded in as if the act had not been passed; and that the benefits of the act should not extend to any person who should, after the passage thereof, be engaged in levying war against the government of the United States, or against the reorganized government of Virginia, adhering to and giving aid and comfort to their enemies. On the 27th of July, 1863, an act was passed by the legislature of West Virginia (Acts 1863, c. 22), entitled, "An act to amend the act staying the collection of certain debts." The provisions of this act, so far as they applied to trust deeds, were as follows: "1. If it shall appear to the judge of any circuit, by satisfactory proof, either in term time or vacation, that any person who has executed a deed of trust on estate, real or personal, * * * is engaged in levying war against the United States, or in giving aid and support to the rebellion, it shall be lawful for the said judge, at the request of any party interested, to issue an order under his hand, directed to the trustee, * * * requiring him to advertise and sell the said estate pursuant to the deed of trust. * * * 3. Where a lien exists by virtue of * * * a deed of trust executed *before* the twenty-sixth day of July, eighteen hundred and sixty-one, on property, either real or personal, * * * upon satisfactory proof thereof, before a judge, either in term time or vacation, of the circuit in which such property may lie, he shall direct the sale thereof, pursuant to said * * * deed of trust. * * * 4. It shall be the duty of such trustee * * * to comply with any such order made as aforesaid, notwithstanding anything to the contrary contained in the act of the general assembly of Virginia, passed January thirtieth, eighteen hundred and sixty-three, entitled 'An act staying the collection of certain debts.' And when any such trustee * * * is so situated, from

any cause, that * * * he cannot comply with such order, it shall be the duty of such judge to appoint one in his place for the purpose, whose duty it shall be to execute such order."

On the 15th of December, 1863, Edwards filed in the circuit court of Kanawha county an affidavit sworn to by him on that day in open court, containing averments "that Samuel S. Thompson, Philip P. Dandridge, Robert M. T. Hunter and Robert H. Maury are grantors in a deed of trust executed by them, and bearing date the 1st day of October, 1854, to James F. Hansford and Isaac N. Smith, authorizing them, as trustees therein, to sell the tracts of land in said deed described; * * * that the above-named grantors in said deed, Thompson, Dandridge, Hunter and Maury, are engaged in giving aid and support to the present Rebellion, carried on by the so-called Confederate States; that the said J. F. Hansford, trustee as aforesaid, hath voluntarily left his home in the county of Kanawha, and gone beyond the federal lines and beyond the process of this court, and is living in a part of the country now adhering to and acting with the so-called Confederate States, and has become so situated that he cannot comply with the obligations and duties as trustee as aforesaid;" and that a large portion of the purchase money secured by said trust deed was still due to said Edwards and unpaid. On the same day, an order was made by the said court, entitled in the matter of a motion by the said Edwards against the said Thompson, Hunter, Dandridge and Maury, "to appoint trustee, &c.," setting forth, that, it appearing to the court, by the affidavit of Edwards, that "the above-named defendants" executed the said trust deed, "and that the said defendants are engaged in giving aid and support to the present Rebellion carried on by the so-called Confederate States, and it further appearing, by said affidavit, that James F. Hansford, trustee in said deed with Isaac N. Smith, is so situated that he cannot unite with said Isaac N. Smith, in compliance with an order for the advertisement and sale of said lands in said trust deed mentioned, wherefore, on motion of the said Edwards, it is ordered, that William J. Rand be and he is hereby appointed a trustee in the place and stead of the said James F. Hansford, to unite with the said Isaac N. Smith in the execution of the said trust deed; and, on like motion, it was further ordered, that the said Rand and Smith do advertise and sell the said lands pursuant to the deed of trust aforesaid." On the same day, the following order was made and signed by the judge of the circuit court for Kanawha county: "To William J. Rand and Isaac N. Smith, trustees, &c.: Whereas, it appearing to me, by satisfactory proof, that Samuel S. Thompson, Philip P. Dandridge, Robert M. T. Hunter and Robert H. Maury, executed a deed of trust, dated 1st October, A. D. 1854, on certain lands in said deed mentioned, lying in the county of Kanawha, and that the said parties are engaged in giving aid and support to the Rebellion, therefore, I, Daniel Polsley, judge of the circuit court for Kanawha county, at the request of William H. Edwards, the beneficial party in said trust deed, do hereby require you, as trustees of and in said trust deed, to advertise and sell the said lands, pursuant to the deed of trust aforesaid." On the 25th of February, 1864, Rand and Smith sold at auction the lands covered by the deed of trust, having given notice of such sale by advertisement published in the Kanawha Republican from December 22d, 1863, to the day of sale. The sale was to Edwards, for $20,000. The report of sale showed that a deed of the land had been made to Edwards by Rand and Smith, and that, after applying the net proceeds of sale towards the payment of what was due on the bonds held by Edwards, there remained due to Edwards thereon, February 25th, 1864, $2,881.46. The deed was dated February 25th, 1864, was signed by Rand and Smith, as trustees, and was recorded in the recorder's office of Kanawha county, February 26th, 1864. It recited, that Edwards conveyed the lands to Thompson and others; that the grantees, to secure the payment of their bonds for the purchase money, conveyed the lands to Hansford and Smith in trust, the book and page of the record of the deed of trust in the office of the clerk of Kanawha county being given; that, on the 15th of December, 1863, Hansford being no longer resident in the county of Kanawha, Rand was, by order of the circuit court of the county, appointed trustee in place of Hansford, as would appear by reference to the records of the court; that, at the request and by the direction of Edwards, who claimed that a large portion of said purchase money was still due and unpaid, Rand and Smith, after having given notice, offered the land for sale to the highest bidder, for cash, at public auction, before the door of the court-house of Kanawha county; that Edwards became the purchaser for $20,000; and that the net proceeds of sale were $19,866.75, and had been applied on the bonds held by Edwards. It then conveyed all the land covered by the trust deed. On the 16th of April, 1864, the original bill in the circuit court of Kanawha county, in the suit of Thompson and others against Edwards and others, was dismissed by that court.

On the 30th of July, 1864, Edwards and his wife, by a deed dated that day and recorded in the recorder's office of Kanawha county, August 22d, 1865, conveyed to the defendants in this suit, the Kanawha and Ohio Coal Company, lands described in the deed as being in the county of Kanawha and state of West Virginia, and as being the same tracts of land conveyed to Edwards by Smith and Rand, by deed dated February 25th, 1864, and recorded in the recorder's office of Kanawha county. The deed expressed a paid consideration of

$2,350,000, and contained covenants for quiet enjoyment and against incumbrances, and a warranty against the acts of the grantors. The defendants took possession of the lands, and were still in possession of them. They had made improvements on them, without any remonstrance or protest from the plaintiffs, and the plaintiffs gave to the defendants no actual notice of the plaintiffs' claim prior to the bringing of this suit. The $2,350,000 was paid to Edwards in the stock of the defendants, to that nominal amount. The bill alleged, and the answer admitted, that the said Thompson, Hunter, Dandridge and Maury, and also all of the corporators of the plaintiffs except two, were, during and for a long time before and after the space of time within which the proceedings in and about the sale of the land under the trust deed took place, domiciled in territory which was under the dominion and authority of a power styling itself the Confederate States of America. It was also averred in the bill, and admitted in the answer, that, during that space of time, war was flagrant between the United States and the Confederate States. It was not specifically averred in the bill or in the answer, that Edwards, during the time in question, was domiciled in territory which was under the dominion and authority of the United States, but the fact was, on the hearing, admitted and assumed by both parties to have been so. There were no allegations, in either the bill or the answer, that were inconsistent with that fact, while there were many allegations in each of those pleadings that were consistent only with that fact. The county of Kanawha, in which the land in question was situated, was at all times confessedly under the dominion and authority of the United States. It was excepted by the president, in his proclamation of August 16th, 1861 (12 Stat. 1262), and in his proclamation of July 1st, 1862 (Id., 1266), as not being territory in insurrection and rebellion against the United States.

James M. Carlisle, William H. Maury, and Edmund Randolph Robinson, for plaintiffs.

John Slosson, Benjamin H. Smith, and John H. Platt, for defendants.

BLATCHFORD, District Judge. As the bill alleges that the deed to the trustees was executed by Dandridge, and as the answer admits that fact, and both parties affirm the deed of trust as one executed by Dandridge, the plaintiffs seeking to redeem the land from it and the defendants claiming title to the land under it, the fact that Dandridge did not join in it is immaterial.

The first question which arises in this case, is as to the status of the plaintiffs. There can be no doubt that they became a corporation under the laws of Virginia on the 14th of December, 1855. But, if there were any defects in the proceedings taken to incorporate them, which has not been shown, those defects were cured by the recognition of the existence of the corporation by the legislature of Virginia, by the passage of the acts of March 17th, 1856, and March 1st, 1858, and the extension and continuance of its corporate rights by the latter act for the term of fifty years. In regard to the claim set up by the defendants, that the plaintiffs forfeited their corporate rights and privileges before this suit was commenced, by the non-user of their franchise or the suspension of their operations, it is sufficient to say, that that is an objection which cannot be taken by these defendants, in this collateral way. Any forfeiture which may have been incurred must be enforced by the government under which the corporate rights are claimed to be held. The government may waive the forfeiture, and will be regarded as having waived it, unless it be shown to have been enforced. Since the passage of the act of March 17th, 1856, it cannot be claimed that the plaintiffs acted ultra vires in acquiring title to the lands in question.

The plaintiffs, as a Virginia corporation, are entitled to maintain a suit in this court against the defendants. as a New York corporation. It is as a Virginia corporation, and solely as such, that the plaintiffs bring this suit. They do not bring it as a corporation of West Virginia, nor is there any evidence to show that they ever became a corporation of West Virginia, any more than the defendants became a corporation of West Virginia. The 12th section of the act of the legislature of West Virginia, passed October 26th, 1863, entitled, "An act providing for the formation of corporations and regulating the same" (Acts 1863, c. 86), and which was passed at the first session of that legislature, recognizes corporations then existing in that state, and provides that certain proceedings may be taken by them which shall result in their being declared by the secretary of the state of West Virginia to be corporations, and also provides that, after that, such corporations shall "no longer be under their former charters." Such recognition is further shown by the 29th section of the same act, and by the 1st section of the act of November 16th, 1863 (Acts 1863, c. 105). The conclusion is clear, that every corporation created by the state of Virginia remained under its charter as a corporation of Virginia, until it became affirmatively a corporation of West Virginia, and that it did not become a corporation of West Virginia by merely having been formed to carry on mining and manufacturing operations in territory which afterwards ceased to be a part of Virginia and became a part of West Virginia. The provision of section 8, of article 11, of the constitution of West Virginia, that such parts "of the laws of the state of Virginia as are in force within the boundaries of the state of West Virginia, when this constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this state until altered and repealed by the legislature,"

taken in connection with the provisions referred to in the acts of the legislature of West Virginia, are decisive on this question. There is nothing to show that the plaintiffs ever became a corporation of West Virginia, or ever ceased to be a corporation of Virginia. The plaintiffs have, therefore, the corporate capacity to sue as a corporation of Virginia.

The main ground urged on the part of the plaintiffs in support of the relief they seek is, that the power of sale under the deed of trust was suspended by the injunction of a competent court until December, 1863; that, during that period, neither the grantors in the deed of trust, who, as between themselves and the plaintiffs, were the real debtors to Edwards, nor the plaintiffs themselves, were, on the facts on which the injunction was granted and continued and finally dismissed, in any default in not paying the debt to Edwards; that, from the time the injunction was dissolved until a time subsequent to the sale to Edwards under the deed of trust and the sale by him to the defendants, all four of the debtors in the deed of trust, and all but two of the corporators of the plaintiffs, were domiciled and resident in the territory of the enemy of the United States, while Edwards, the creditor, was domiciled and resident in the territory of the United States, the war being in progress during the intervening period; that, by reason of these facts, the proceeding taken by Edwards in February, 1864, to enforce the payment of his debt against the grantors in the trust deed, by a sale of the land under the deed of trust, was illegal and void; that no title to the land passed to Edwards by virtue of such proceeding; and that the plaintiffs are, therefore, not barred or foreclosed of their equity of redemption in the land, but are entitled to redeem it from the defendants, as the owners and holders of the debt secured to Edwards by the deed of trust.

The proceeding taken in February, 1864, to sell the land under the deed of trust, was a proceeding by Edwards, as creditor, to enforce payment of a debt due to him by Thompson, Dandridge. Hunter and Maury, as debtors. The enforcement was, indeed, not by a judgment that the debtors personally pay the debt to the creditor. but was by a sale of land which the debtors had specifically put in trust to pay the debt. Nevertheless, the foundation of the proceeding was, that the debt existed and that the debtors had not discharged it. The duties and rights of the debtors and the creditor were correlative. The right which the creditor undertook to exercise, by enforcing a sale of the land, was the right to compel the discharge of the debt in invitum by that means, so far as the proceeds of the sale would go. That right could not exist in favor of the creditor, unless there existed at the same time a corresponding duty and capacity on the part of the debtors to pay the debt to the creditor. Since the decisions in the cases of The Venice, 2 Wall.

[69 U. S.] 258, 274; Mrs. Alexander's Cotton. Id. 404, 419; Mauran v. Insurance Co., 6 Wall. [73 U. S.] 1, 14; Ouachita Cotton, Id., 521, 530, 531; Hanger v. Abbott, Id. 532, 535; Coppell v. Hall, 7 Wall. [74 U. S.] 542, 554; McKee. v. U. S., 8 Wall. [75 U. S.] 163, 166; and U. S. v. Grossmayer, 9 Wall. [76 U. S.] 72,—it must be regarded as settled, that the late war between the so-called Confederate States and the United States was a public war, and a war not only between the respective governments, but between all the inhabitants of the one territory on the one side and all the inhabitants of the other territory on the other side, so that all the people of each must be regarded as having been enemies of all the people of the other, during the continuance of the war; and that, not only on general principles did the existence of such war import a prohibition of all unlicensed commercial or business intercourse and correspondence between persons domiciled in the one territory and persons domiciled in the other, but, by the express provisions of the 5th section of the act of congress of July 13th, 1861 (12 Stat. 257), and of the proclamation of the president of August 16th, 1861 (Id., 1262), issued in pursuance thereof, all commercial intercourse between the territory that was in a state of insurrection against the United States and the citizens thereof, and the citizens of the rest of the United States, became unlawful during the continuance of such condition of hostility. The question arises, then —what is comprehended within the words, "commercial intercourse?" In the case of U. S. v. Grossmayer [supra], a creditor in New York, during the war, directed his debtor in Georgia to invest the amount of the debt in cotton and hold it for him till the close of the war. The cotton was bought and the creditor was, during the war. advised by the debtor of the purchase. The cotton having been captured at Savannah by the military forces of the United States, the creditor. Grossmayer, claimed it as his property. The court of claims awarded it to him. but the supreme court, on the foregoing facts, reversed the judgment. In its decision the supreme court says: "It has been found necessary, as soon as war is commenced, that business intercourse should cease between the citizens of the respective parties engaged in it, and this necessity is so great, that all writers on public law agree that it is unlawful without any express declaration of the sovereign on the subject." The court then refers to the act of July 13th, 1861, prohibiting all commercial intercourse, and says, that the transaction in that case was not only inconsistent with the duties growing out of a state of war, but in open violation of that statute. It adds: "A prohibition of all intercourse with an enemy during the war affects debtors and creditors on either side, equally with those who do not bear that relation to each other. We are not disposed to deny the doctrine that a resident in the territory of one of the bellig-

erents may have, in time of war, an agent residing in the territory of the other, to whom his debtor could pay his debt in money, or deliver to him property in discharge of it, but, in such a case, the agency must have been created before the war began, for there is no power to appoint an agent for any purpose after hostilities have actually commenced; and to this effect are all the authorities. The reason why this cannot be done is obvious, for, while the war lasts, nothing which depends on commercial intercourse is permitted." The decision was, that if the debtor was to be considered as the agent of the creditor to buy the cotton, the intercourse which appointed him agent was unlawful; and that, even if the relation of principal and agent was not created, but only that of debtor and creditor continued, the debtor and the creditor were prohibited from having any dealings with each other during the war. There can be no doubt, that if, on the dissolution of the injunction obtained by Thompson and others, as debtors, against Edwards, as creditor, Edwards had notified the debtors of the fact, and required them to pay the debt to him within a certain time, under pain of having the land sold if the debt were not paid, the payment of the debt by them to Edwards would have been business and commercial intercourse, and, therefore, unlawful. How, then, can this penalty be enforced against them, for not doing what it was unlawful for them to do? The proposition need only be stated to carry with it its own answer. No such proceeding can be upheld. The remedy for the recovery of the debt in this case by a sale of the trust land was suspended during the war.

In Tucker v. Watson, 6 Am. Law Reg. (N. S.) 220, in the court of appeals of Virginia, it was held, that the payment of a debt by a Massachusetts debtor to a Virginia creditor during the war, whether made in Massachusetts or in Virginia, was unlawful; that the remedy for the recovery of the debt was suspended during the existence of the war; and that interest on the debt during such suspension was not recoverable.

In Jackson Ins. Co. v. Stewart [Case No. 7,152], in the circuit court of the United States for the district of Maryland, it was held, that the right of a Tennessee creditor to sue a Maryland debtor in that court during the war was suspended; that the statute of limitations did not run in favor of the debtor during such suspension; and that interest on the debt during such suspension could not be recovered.

In Hall v. Connecticut Mut. Life Ins. Co. [68 Ill. 357], a case where a mortgage on lands in Chicago had been foreclosed at Chicago, during the war, against a mortgagor and debtor who was domiciled in insurrectionary territory at the time, it was held by the superior court of Chicago, that, pending the late war, it was not lawful for a creditor residing in the United States to receive payment of his debt from his debtor residing in the Confederate States; and that the proceeding to foreclose the mortgage during the war, as an enforcement of the contract of mortgage in rem against the land mortgaged, was void. The view of the court was, that the publication in a newspaper of a notice directed to the debtor, informing him that, as he had failed to pay his bond, a bill had been filed to foreclose the mortgage, was illegal, as an act of unlawful intercourse with the enemy, whether it was expected that the debtor would receive the notice, or could not act upon it if he did receive it, or would not receive it; and that no rightful jurisdiction of a court could be founded on such an act. In the present case, the trust deed provided, that, in case of any sale of the trust lands by the trustees under the deed of trust, they should give at least sixty days' notice of the time and place of sale. The object of this notice must be held to have been to apprise the debtors that the creditor was about to sell the land, and that they must pay the debt and thus redeem the land and stop the sale within the sixty days. The presumption must be, either that the debtors saw the notice which the trustees published, or that they did not see it. If the presumption be that they saw it, they could only have seen it by means of an unlawful intercourse which this court cannot sanction. If the presumption be that they did not see it, because, by reason of hostilities, it could not reach them, it would be a fraud on them to uphold a sale made on a notice so given. A notice was made indispensable by the terms of the contract, and was necessary to be given, not only as a condition precedent to any right of the trustees to sell, but as affording time to the debtors to pay the debt and thus save the land from sale, on the presumption that they would see the notice on its being given, under circumstances where it was lawful for it to pass as a communication from the trustees to the debtors. There is no pretence that Smith and Rand, the persons who acted as trustees in publishing whatever notice was given under the deed of trust, were not domiciled at the time in the territory of the enemies of the debtors.

In Cuyler v. Ferrill [Case No. 3,523], it was held by the circuit court of the United States for the Southern district of Georgia, that a state court of Georgia had no jurisdiction, during the war, to decree a partition and sale of lands in Georgia, as against the plaintiff, a citizen of Pennsylvania, interested in them. It was observed by the court that, whether either actual or constructive notice of the proceedings in Georgia reached the plaintiff at the time, he could not be charged with laches, for a response by him to the notice would have been a breach of his allegiance to the United States.

In Semmes v. City Fire Ins. Co. [Id. 12,651], it was held by the circuit court of the United States for the district of Connecticut,

that a contract of insurance against fire made by a Connecticut corporation in Georgia, a loss under which occurred before the war, and the beneficial interest in which always belonged to persons domiciled in Mississippi, was, with all right of action on it, suspended during the war.

The right of action that is suspended must include the right to resort to any species of proceedings, judicial or otherwise, to enforce the contract. In the present case, the suspension included the right of the creditor to procure, from the judge of the circuit in which the property was situated, the appointment of Rand as a trustee in the place of Hansford, who was still living, and who had been selected as one of the trustees by both of the parties to the contract, as well as the right of Smith and Rand to lay the foundation for exercising the power of sale, by giving a notice which it was unlawful for the debtors to receive.

As it was unlawful for the debtors to pay the debt to their enemy creditor during the war, it would be subversive of the first principles of justice to permit the creditor at the same time to enforce the payment of the debt by a sale of the land—especially so, when the debtors were, by the terms of the contract, entitled to a notice of sixty days, which it was unlawful for them to receive, or for the trustees to give to them. The proceedings in respect of the sale were void. Edwards acquired no title under it to the land, as against the debtors, and their grantees of the equity of redemption, the plaintiffs; and the defendants acquired no title to the land from Edwards, as against the same parties. The right of the debtors and of the plaintiffs to redeem the land from the lien or incumbrance of the deed of trust, by paying the debt secured thereby, remains, notwithstanding the attempted sale under the deed of trust. Such right stands in the same condition as if there had been no such attempted sale. Such sale is of itself no defence to the right of the plaintiffs to exercise such right of redemption. The plaintiffs, though not the debtors by contract with Edwards, or as between themselves and their grantors, have the right, as owners of the land by deed from the debtors, to claim to exercise the privilege, if they choose, of redeeming the land from the charge. The debtors would have the same right, but no good reason can be assigned why the plaintiffs should not have and exercise an equal right. The right, if exercised by the debtors, would enure to the benefit both of themselves and of the plaintiffs, by relieving the former from liability on their covenant of warranty, and by relieving the land of the latter from an incumbrance. The right, if exercised by the plaintiffs, will relieve the land from the incumbrance. The plaintiffs have, therefore, a sufficient interest to sustain alone this suit for redemption.

Nor can there be any doubt that this suit for redemption is properly instituted by the defendants. Although their title to the land fails by reason of the illegality of the proceedings for the sale of the land, yet they have succeeded to all the rights of Edwards under the deed of trust, and in and to the debt secured thereby. Effect will be given to the transaction between Edwards and the defendants, in so far as it conveyed anything to the defendants. Although the defendants did not, as against the plaintiffs, become legally grantees of the land from Edwards, yet they will be regarded in this suit, and for the purpose of giving to the plaintiffs the relief to which, as owners of the equity of redemption in the land, they are entitled, as assignees from Edwards of the debt, and of his interest under the trust deed. Jackson v. Bowen, 7 Cow. 13; Robinson v. Ryan, 25 N. Y. 320, 325; Hunt v. Hunt, 14 Pick. 374; Freeman v. McGaw, 15 Pick. 86. Especially will this be so in a case where, as here, the conveyance from Edwards to the defendants contains a covenant for quiet enjoyment, and against all incumbrances.

The plaintiffs and the defendants being, then, in court, as proper parties to the suit, what are the defences set up, irrespective of those involved in the questions already considered?

It is objected, that, as this suit relates to lands lying in West Virginia, this court has no jurisdiction of this suit. But, it is the ordinary case of a bill to redeem a mortgage. The owner of the equity of redemption, or the party entitled to redeem, must seek the mortgagee, or the party holding the lien on the land, in the forum where jurisdiction in personam can be obtained over such mortgagee or party, without reference to the situs of the land. The subject of controversy is immediately the mortgage or trust security from under which the land is sought to be redeemed. That is personal property and follows its owner.

It is urged, that a decree allowing the plaintiffs to redeem will affect the rights of Edwards as warrantor to the defendants; and that, therefore, Edwards is a necessary party. If the defendants are fully assignees from Edwards of the debt and the security for it—and it is on that view alone that the plaintiffs can come in to compel the defendants to allow redemption—then Edwards is not, as between the plaintiffs and the defendants, a necessary party to this bill to redeem. There can be no difficulty in adjudicating upon the rights of the defendants, as against the plaintiffs, without the presence of Edwards as a party. What liability Edwards may ultimately come under to the defendants by reason of covenants he has heretofore made with them, is something which does not concern the plaintiffs; and Edwards, not being a party to this suit, can be in no manner affected or prejudiced by any decree therein.

It is also contended, that Thompson, Dandridge, Hunter and Maury are necessary par-

ties to this suit. But, a mortgagor, who has parted with his equity of redemption in the mortgaged premises, is not a necessary party, either to a bill by the mortgagee to foreclose such equity of redemption, or to a bill by the assignee of the equity of redemption, against the mortgagee or the assignee of the mortgage, to redeem the premises from the lien of the mortgage. Such is the position of the grantors in this trust deed.

It is also claimed, that Hansford and Smith and Rand are necessary parties. But, they never had any beneficial interest in the debt or in the land, and no power to control the disposition by Edwards of his interest in the debt and in the security therefor. The debtors could have destroyed the lien of the deed of trust by payment of the debt to Edwards, without the intervention of the trustees, and there is no reason why the plaintiffs cannot equally destroy such lien by paying the debt to the assignees of Edwards, without the intervention of any of such trustees. So, also, as to Coleman, Morris and Coleman, it is not perceived how they are necessary parties.

It appears, by the record, that, on the 14th of April, 1866, Thompson, Dandridge, Hunter and Maury tendered to the circuit court of Kanawha county, West Virginia, a bill of review and supplemental bill, praying that court to review, reverse, annul and set aside the decrees of that court of December 14th, 1863, and April 16th, 1864, and asked that such bill might be filed; and that the court, on the 14th of April, 1866, made an order, stating that it was of opinion not to allow said bill of review to be filed, and that there were no errors in the said two decrees which ought to be reviewed or corrected by the court, and that it, therefore, refused to allow the bill to be filed, and also refused to review, or reverse, or annul, or set aside the said two decrees or either of them. The defendants named in such bill of review included, among others, Edwards and his wife and the defendants in this suit. The plaintiffs in this suit were not named in it as defendants. The prayer of it was, that the two decrees in the original suit be set aside, the cause be restored to the docket, the sale by Smith and Rand be set aside, the injunctions which had been dissolved be reinstated, the sale by Edwards to the defendants in this suit be confirmed, and they or Edwards be ordered to pay into court the $2,350,000 purchase money of the land, and their title be perfected on such payment of such money into court, and that such money be paid to the plaintiffs in such bill of review as the true owners of the land. From the decree refusing to allow the bill of review to be filed, Thompson, Dandridge, Hunter and Maury appealed to the supreme court of appeals of West Virginia, and that court, on the 3d of September, 1869, made a decree adjudging that the sale of the 25th of February, 1864, by Smith and Rand, trustees, to Edwards, was valid. This last-named decree is set up by the defendants in this suit,

in bar of the plaintiffs' claim in this suit. To this defence it is a sufficient answer to say, that the plaintiffs in this suit were not parties either to the original suit in the circuit court of Kanawha county, or to any of the supplemental bills filed therein, or to the bill of review, or to the appeal to the supreme court of appeals of West Virginia—in other words, to any of the litigation promoted by their grantors. The deed to the plaintiffs from Thompson and others was recorded on the 8th of March, 1856, in the Kanawha county clerk's office. The deed to Coleman and others from Thompson and others was recorded on the same day, in the same office. The deed to the plaintiffs from Coleman and others was recorded on the 4th of September, 1856, in the same office. The original suit in the circuit court of Kanawha county, by Thompson and others, was not brought until the 10th of November, 1857. The rights of the plaintiffs which they are seeking to enforce in this suit accrued before the litigation commenced, and not post litem motam, and their title was on record in the proper office when such litigation commenced. Thompson and others being, as between themselves and the plaintiffs, as well as between themselves and Edwards, the real debtors to Edwards, even after the plaintiffs obtained title to the lands, brought the suit by reason of their own interest in the subject matter of the litigation. But the plaintiffs were not parties to it, nor were they privies to it, even though they may have known of its existence, and have informed the plaintiffs in it of the alleged defect of title in Edwards, on which it was founded. The plaintiffs are, therefore, not concluded from asserting in this suit the illegal character of the assumed sale to Edwards under the trust deed.

The defendants set up, in their answer, that they purchased from Edwards without any notice of any claim on the part of the plaintiffs to the land in question, and without any notice of any equity or right of redemption therein on the part of the plaintiffs. This allegation is contradicted by the record, for, not only were the deeds to the plaintiffs on record in the proper recording office of the county where the land purchased by the defendants was situated, but the deed from Edwards to the defendants refers to the land conveyed as land that had been conveyed to Edwards and his wife by Smith and Rand, trustees, by the deed of February 25th, 1864, and refers to this last-named deed as being recorded in the recorder's office of Kanawha county. The deed to the defendants is dated and acknowledged by Edwards, July 30th, 1864, and is acknowledged by his wife, August 2d, 1864. The deed from the trustees to Edwards was recorded February 26th, 1864. The defendants had notice, therefore, of all that is shown by the face of the deed from the trustees to Edwards, and of all that they were fairly put on inquiry by that deed to learn. That deed

states, that the deed of trust was given to Hansford and Smith, trustees, and gives the date of it, and the names of the grantors in it, and states that it was given to secure the debt due to Edwards by such grantors, and gives the place and book and page of its record. It also states the appointment of Rand, and by what court it was made, and that Edwards purchased the land, on a sale of it by Smith and Rand, under said deed of trust. The defendants were, by the deed from Smith and Rand to Edwards, remitted to the records of the circuit court of Kanawha county, and to the order appointing Rand trustee in place of Hansford. That order recites the deed of trust, and states its place of record. The deed of trust refers to the deed from Edwards to Thompson and others, as being intended to be recorded in the clerk's office of Kanawha county, at the same time with the recording of the deed of trust; and such deed from Edwards describes the grantees in it as "all of Virginia." The order appointing Rand trustee also describes the grantors in the deed of trust as being engaged in giving aid and support to the then existing Rebellion, "carried on by the so-called Confederate States." On these facts, the defendants must be held chargeable with notice of the actual status of Edwards and of his debtors, as respected each other, in view of the Rebellion and the war. The defendants were, therefore, fully notified to take heed and see that the sale to Edwards was a valid sale, as against the plaintiffs, before purchasing from Edwards. They must, therefore, be held to have taken upon themselves the risk of its turning out that the sale to Edwards was invalid, as against the plaintiffs, and the risk of its being established that a right of redemption still existed in the plaintiffs. The right of the plaintiffs to redeem this land from the lien which still exists on it under the deed of trust, is, therefore, established.

It is set up, in the answer, that the defendants have, since they purchased and took possession of the land, expended more than the sum of $200,000 in erecting structures, opening mines, building roads, and constructing necessary appurtenances to the business to be conducted on the land, and making other improvements thereon; that the plaintiffs and their corporators knew that the defendants were in possession of the land as purchasers and claimed to own it, and were engaged in making such improvements and expenditures; that neither the plaintiffs nor their corporators made any objection thereto, or gave any notice of their claim to the defendants; and that the defendants took possession of the land on or about July 30th, 1864, and have ever since been in possession of it, but have derived no profits from it. The only evidence, as to these averments, is a stipulation by the parties, that the defendants have made improvements on the land in question, and that

the plaintiffs did not remonstrate or protest against the making of such improvements by the defendants, and that the plaintiffs gave no actual notice of their claim to the defendants, until the bringing of this suit. The bill prays, that the sale to Edwards under the deed of trust, and the sale by Edwards to the defendants, may be decreed to be null and void; that the plaintiffs may be let in to redeem the land, on paying so much as shall be decreed to be due and owing on the bonds given by Thompson and others to Edwards; that the defendants may be decreed to account with the plaintiffs touching the rents, issues and profits of the land, and may be ordered to pay to the plaintiffs the value of the rents, issues and profits of the land which they have received and taken; and that it may be given in charge to a master to ascertain the value of the rents, issues and profits which the land might have been made to yield during the space of time in which the defendants have been in possession of it.

It is claimed, on the part of the defendants, that, inasmuch as the plaintiffs, at least from the close of the war, in June, 1865, until the filing of this bill, on the 31st of December, 1868, saw the expenditures going on, the plaintiffs being out of possession of the land, and the defendants being in possession of it, and made no remonstrance or objection, the plaintiffs ought not to be allowed to redeem the land, except on condition of first reimbursing to the defendants such expenditures. On the other hand, it is contended, on the part of the plaintiffs, that, inasmuch as the answer of the defendants shows that, when the defendants made the purchase of the land from Edwards, Edwards was the president of the defendants, and was one of the nine trustees of their corporation, and that such trustees were the officers managing and directing the affairs of the defendants, and that the defendants made the purchase of the land by and through the said trustees, acting as its agents in the premises, it must be held that the knowledge which Edwards had was possessed by the defendants, aside from the rule as to notice, before referred to, based upon the state of the records in the recording office of Kanawha county; that, as Edwards must be held in law to have known, on the facts in his possession, the illegality of the attempted sale under the trust deed, the defendants, being chargeable with knowledge of the same facts, are chargeable, also, with knowledge of such illegality; that, therefore, the defendants cannot, in judgment of law, be held to have acted bona fide, or under a reasonable belief that they were acquiring, as against the plaintiffs, a good title to the land; and that, consequently, they are not entitled to be protected, in respect of the expenditures which they made on the land.

It is a settled principle of equity jurisprudence (2 Story, Eq. Jur., 9th Ed., § 799a) that, if a plaintiff in equity seeks the aid of the court to enforce his title against an innocent

person, who has made improvements on land, supposing himself to be the absolute owner, aid will be given to him only upon the terms that he shall make due compensation to such innocent person, to the extent of the benefits which will be received from such improvements; that if, in such a case, the plaintiff has fraudulently concealed his title, and has thereby misled the defendant, the title to such compensation is founded in the highest justice; but that, independently of any such fraud, if the plaintiff seeks from an innocent person an account of the rents and profits of an estate on which the latter has made improvements, without any notice of any defect in his title, a court of equity, in decreeing an account, will allow him to deduct or recoup therefrom a due compensation for his improvements. It is equally well settled (1 Story, Eq. Jur., 9th Ed., § 385), that, if a party who has title to an estate stands by and allows an innocent purchaser to expend money upon the estate, without giving him notice, such party will not be permitted by a court of equity to assert that title against such purchaser without fully indemnifying him for all his expenditures. The defendants claim that they are, and the plaintiffs claim that the defendants are not, in respect to the expenditures made by the defendants on the land in question, entitled, within these principles, to be allowed for such expenditures. At present, however, there are not sufficient facts before the court to enable it to pass upon the equities of the parties in this respect. The subject was not very fully discussed on the hearing, and, indeed, it could not have been, for the facts as to the nature, character, time, and circumstances of the expenditures were before the court only on the pleadings in the case, and on the inconclusive stipulation before mentioned. It is proper that the question as to whether there shall be an allowance to the defendants for such expenditures, and the question as to whether, if the expenditures shall be found to have exceeded any rents and profits properly chargeable against the defendants, the payment of such excess shall be made a condition precedent to the exercise of the right of redemption by the plaintiffs, and various other questions which will undoubtedly arise on the report of a master as to such expenditures, and their nature and character, and the time and circumstances under which they were made, and the status of the plaintiffs and their corporators, and of the defendants and their corporators, in regard to such expenditures, should remain open for consideration. It is not necessary that such questions should be decided now, or until all the equities between the parties, in that regard, are brought fully before the court. Such was the course pursued in Bright v. Boyd [Cases No. 1,875, 1.876]. Those questions, and also the question as to whether such paper title as the defendants purport to have to the land in question, shall be con-

veyed by them to the plaintiffs, and the question of costs, and all other questions, are reserved until the coming in of the report of the master.

A decree will be entered, declaring the sale under the deed of trust, and the deed from Smith and Rand to Edwards, and the deed from Edwards to the defendants, to be null and void, so far as respects the conveyance of any title to the land, as against the plaintiffs, and that the defendants acquired no title thereby, as against the plaintiffs, to the land in question, and that, by virtue of the premises, the defendants have a lien on the land to secure the payment of the amount due and unpaid on the debt secured by the deed of trust, they being the owners of such debt, and that the plaintiffs are entitled to redeem the land from such lien; and ordering a reference to a master, to take and state an account of the amount due on such debt, and of the amount of the rents, issues, and profits of the land in the hands of the defendants, and of the amount of the expenditures made by the defendants in improving the land; and reserving all other questions until the coming in of such report.

NOTE. The following was the decree in the cause: "This case having come on to be heard upon the pleadings therein, and a stipulation of the respective parties, and James M. Carlisle and William A. Maury having been heard on the part of the plaintiffs, and John Slosson and Benjamin H. Smith on the part of the defendants, and the plaintiffs having applied to the court to strike out William H. Edwards, as a defendant, and to dismiss the bill in respect to him, upon the ground that the said Edwards is a citizen of the state of West Virginia, as is averred in the defendants' answer, it is ordered, that such application be, and the same is hereby granted. It is also ordered, adjudged, and decreed, that the sale, made on the twenty-fifth of February, 1864, by William J. Rand and Isaac N. Smith, as trustees, of the lands covered by the deed of trust to James F. Hansford and Isaac N. Smith, trustees, mentioned in the pleadings herein, and the deed thereof by said Smith and Rand to said Edwards, and the deed thereof by said Edwards to the defendants, were all and each of them null and void, so far as respects the conveyance of every and all of the said lands, as against the plaintiffs, and that the defendants acquired no title thereby, as against the plaintiffs, to the said lands, and that the defendants have a lien on said lands, to secure the payment of the amount due and unpaid on the debt secured by the said deed of trust, they being the owners of the said debt, and that the plaintiffs have the right to redeem the said lands from such lien; and that it be, and is hereby referred to John Sedgwick, Esquire, of the city of New York, counsellor at law, as master, pro hac vice, with the usual powers of a master, to take and state an account of the amount due on said debt, and an account of the amount of the rents, issues, profits, proceeds, and productions of the said lands, with which the defendants are properly chargeable, and an account of the improvements made on said lands, through expenditures made by the defendants, which improvements remain as benefits to be received by the plaintiffs, as owners of said lands, and their value at the time of making his report; and, the said master is directed to enquire and report as to the circumstances under which such improvements were made, and whether the same were made in

good faith or not. and whether with or without notice of defect of title, and whether the plaintiffs ought to render compensation for the same to the defendants. and, if so, in what amount. And the court doth further direct, that, in taking such accounts. and making such inquiries, the said master may call for the production of such books and papers as it may seem to him fitting. and may examine such witnesses, and at such places, as shall seem to him proper, and receive and consider such depositions as shall be offered in evidence by either of the said parties, and may inspect the said lands; and that he return, with his report, all such testimony as shall be adduced before him, and that he, with all convenient speed. make report to the court of his proceedings in the premises. All other questions are reserved until the coming in of said report."