## The Emma Kate Ross et al.

## Myers Excursion & Navigation Co. v. The Emma Kate Ross et al.

*(Circuit Court, D. New Jersey. May 8, 1891.)*

1. .Collision—Crossing Courses Under Steam.

    A steam-tug and a steam-boat approached each other on crossing courses in the Hudson river, when the tide was about slack water, on a bright moonlight night. Each vessel was seen from the other a considerable time before the collision.    The red light of. the tug was first seen from the steam-boat, which was going down stream, and a little later the green light also, when she gave a signal by one blast of her steam-whistle, and held on her course. The steam-tug answered with one blast, and did not change her course either until too late to avoid collision.  *Held* that, under the provision of Rule 19, Rev. St. U. S. § 4233, that if two steam-vessels are crossing so as to involve the risk of collision, the one which has the other on her .own starboard side shall keep out of the way, the steam-tug should have passed under the stern of the steam-boat, and was at fault in persistently attempting to cross her bows.

2. Same—Demurrage—Net Value of Charters.

    . An excursion steamer was so injured in a collision as to be necessarily delayed for repairs 21 days, during all but one of which she was under charter.  Her engagements were filled by other vessels of the libelant, on all but eight days, when another steamer was hired to take her place.  *Held*, that an allowance of the net value of her charters for the days on which her place was taken by other vessels of libelant was proper.

    . . Affirming 41 Fed. Rep. 826.

In Admiralty.  Appeal from district court.

*Wing, Shoudy & Putnam,* for appellants.

*Robert D. Benedict,* for appellee.

### FINDINGS OF FACT.

Acheson, J.   The court finds the following facts:

*First.* On the 23d day of June, 1888, at about 11 o'clock p. m., a collision occurred on the Hudson river, a short distance south of the ferry of the Pennsylvania Railroad Company, between the claimants' steam-tug, the Emma Kate Ross, bound from pier No. 1, North river, New York city, to the Red Star Steam-Ship Company's docks, Jersey City, and the libelant's side-wheel steam-boat Crystal Stream, bound from the foot of Thirty-Fifth street, New York city, to the Communipaw Coal Company's docks, Jersey City.   It was a bright, moonlight night. The tide. was about slack water, running ebb on the New Jersey shore. There was no wind.. .

*Second.* Both vessels were in plain sight of each other, and each was actually seen from the other some considerable time before the collision.

*Third.* The two vessels were on crossing courses, and from the time they came in sight of each other until the moment of collision the Emma Kate Ross had the Crystal Stream on her own starboard side.

*Fourth.* The Crystal Stream was proceeding down the river on a southerly course, parallel with the New Jersey shore, and about 300 yards distant easterly from the exterior line of the piers.   When about opposite the Pennsylvania Railroad Company's ferry, the pilot of the Crystal Stream sighted the red light of the Emma Kate Ross.   A little later her

green light also came in sight of the pilot of the Crystal Stream. Then the Crystal Stream signaled by one blast of her steam-whistle, and the Emma Kate Ross immediately replied with one blast of her whistle. The vessels were then not far apart; probably they were from 300 to 400 yards distant from each other. The Crystal Stream kept on her course down the river without change. Upon the interchange of signals the Emma Kate Ross did not immediately change her course, which was towards the Crystal Stream, and she continued her approach until a collision was unavoidable.

*Fifth.* The acting pilot (who was the mate) of the Emma Kate Ross, from the time he sighted the Crystal Stream, determined to cross her bow, and he unwisely persisted in that intention until the two vessels had come into close proximity, and a collision was imminent. He then put his wheel hard-a-port and had the engine backed at full speed. But this attempt to avoid a collision was too late. The Emma Kate Ross ran her stem with great force into the port side of the Crystal Stream, about 50 feet from her stern, breaking her wheel-beam and crank, the holding-down bolts in the main deck, and the eccentric rod, carrying away the A frame, and doing other damage.

*Sixth.* The necessary repairs to the Crystal Stream cost the sum of $2,682.41, and while undergoing repairs she was necessarily delayed 21 days. She was used by the libelant in the excursion business, and every day but one during the time she was undergoing repairs she was under charter. To fulfill her contracts the libelant used in place of the injured vessel other steamers which the libelant owned, except on eight days, when the libelant hired the steamer Moran. The net value of the charters of the Crystal Stream on the days when her contracts were filled by other boats of the libelant was $1,776.48. The amount paid for the Moran when she was substituted for the Crystal Stream was $880.

### CONCLUSIONS OF LAW.

1. Undoubtedly the two steamers were subject to Statutory Rule 19, § 4233, Rev. St. U. S.: "If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." It was then the plain duty of the Emma Kate Ross to keep out of the way of the Crystal Stream. *The Corsica,* 9 Wall. 630; *The Cayuga,* 14 Wall. 270. There was nothing to prevent the steam-tug complying with the rule by going under the stern of the Crystal Stream, or otherwise avoiding her.

2. In persisting up until the collision became imminent, in his purpose to cross the bow of the Crystal Stream, the officer in charge of the steam-tug was highly culpable; and it was this rash attempt to cross the bow of the Crystal Stream which brought about the catastrophe.

3. In keeping her course the Crystal Stream performed her statutory duty. Rule 23, § 4233, Rev. St.; *The Corsica, supra.* No special circumstances existed calling for a departure from the rule which required her to "keep her course." Her signal imported that she intended to do what the law required her to do; that is. to keep on her course, and not

change it. *The John Taylor*, 6 Ben. 227, 230; *The E. H. Coffin*, 9 Ben. 20.

4. In my judgment the Crystal Stream was free from fault, and the Emma Kate Ross is altogether responsible for the collision.

5. In allowing demurrage on the days when other vessels of the libelant took the place of the Crystal Stream, the commissioner and the court followed the rule laid down by the supreme court. *The Cayuga*, 14 Wall. 270; *The Favorita*, 18 Wall. 598. Nor have the appellants any good ground of complaint that the allowance was for the net value of the charters of the Crystal Stream during those days. The libelant had proposed to show "what was the average charter price of the boat," but on the part of the claimants it was objected "that the charters for the days intervening would be the best evidence," and thereupon the latter line of proof was pursued. The position now insisted on that the proof should have been of "the fair market value" of the Crystal Stream does not seem to me to be well taken. It is only when there is no fixed charter rate that resort is properly had to the opinions and estimates of witnesses to fix a *per diem* value. *The Cayuga*, 7 Blatchf. 391.

6. The decree of the district court must be affirmed, and a decree entered in this court in favor of the libelant for the sum of $5,801.99, with interest thereon from January 2, 1891, and the further sum of $316.08, costs of the district court, and the costs of this court to be taxed.