## THE CAYUGA.

1. Although where two steamships are running in the same direction—the ship astern sailing faster than the ship ahead—the ship astern is in general bound to adopt the necessary precautions to avoid a collision, the rule does not in general apply in a case where the ships are running on intersecting lines, and the faster sailer is *thus* coming up. In such a case the fourteenth article governs, and the ship which has the other on her own starboard side must keep out of the way.

2. *Restitutio in integram* being the rule in suits for damages occasioned by collision, demurrage was held to have been rightly given to the owners of a New York ferry-boat, injured by a tortious collision, during the number of days that she had necessarily to lay by for repairs, the rate being fixed at what the superintendents of three principal ferries of New York gave it as their opinion, assigning their reasons and showing estimates, that the service of the boat was worth; and this right to demurrage was held not to be affected by the fact that no *charter rate* per day existed for ferry-boats, or the other fact that the owners of the boat (a ferry company) had another ferry-boat which they kept for emergencies, and which they put on the line during the time that the injured one was repairing.

ERROR to the Circuit Court for the District of New York; the case being thus:

Congress, by an act of April 29th, 1864, "fixing certain

---

* Cheang-kee *v.* United States, 3 Wallace, 320; Bronson *v.* Rodes, 7 Id. 245; Butler *v.* Horwitz, Ib. 259; Trebilcock *v.* Wilson, 12 Id. 687.

rules and regulations for preventing collisions on the water," made among them the following:

### TWO SHIPS UNDER STEAM MEETING.

*Article* 14. If two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way.

### CONSTRUCTION OF ARTICLES 14, &c.

*Article* 18. Where by the above rule one of two ships is to keep out of the way, the other shall keep her course subject to the qualifications contained in the following article:

### PROVISO TO SAVE SPECIAL CASES.

*Article* 19. In obeying and construing these rules due regard must be had to all dangers of navigation, and due regard must also be had to any special circumstances which may exist in any particular case, rendering a departure from the above rules necessary in order to avoid immediate danger.

With these rules in force the James Watt, a North River ferry steamboat, and a fast sailer, set out from her slip at Hoboken, New Jersey, opposite the upper part of New York, to make her regular ferry trip to her slip at the foot of Barclay Street, a point about a mile lower down on the opposite side of the river. This made her course across the river southeast. A few minutes previously the steam-tug Cayuga, a less fast sailer than the ferry-boat, was setting out from her slip at Desbrosses Street, a point on the New York side about half a mile lower down than Hoboken, and of course about half a mile above Barclay Street. Her purpose was to go over to certain wharves on the Jersey shore, not very far from opposite Barclay Street; meaning, however, first to go in to Hubert Street—a street about seven hundred feet below Desbrosses—and there to take a boat in tow. Setting off, she did round in as if to go in to Hubert Street, but perceiving that she could not get the boat out from the place (the dock being then crowded), rounded out again, and pursuing a course about south-southwest went out toward the middle of the river, about one-third into the stream. Pur-

suing their respective courses the two boats were on intersecting lines; *the tug having, of necessity, the steamer on her starboard side until the point of intersection should be passed.* The ferry-boat having been the faster sailer, and her point of departure at Hoboken having been farther north than that of the tug on the opposite or New York side of the river, she was continually coming nearer to the tug, but coming up on an intersecting line and not directly astern. The possibility of a collision was, of course, obvious to any intelligence, from the time the two boats left their respective wharves. As they got near the middle of the stream it became more plain; and by degrees, as they approached, the possibility passed into a probability.

Coming quite near to each other, *the ferry-boat being still on the tug's starboard side,* and just before reaching the point where their courses if adhered to would intersect, the tug stopped her engine for a short time, and then put it ahead. The ferry-boat having supposed, when she saw that the tug's engine was stopped, that it was meant that *she,* the ferry-boat, should go ahead, now dashed on, but the tug after a short stoppage put her engine into motion again, and a collision followed. The ferry-boat was struck on the port bow, and so much injured that she had to go into dock and remain there seventeen days for repairs; the company which owned her putting on the line a spare boat which they owned and kept to supply emergencies. Hereupon the owners of the ferry-boat libelled the tug in the District Court at New York. That court condemned the tug, and awarded to the owners of the ferry-boat $75 a day for the time she was necessarily laid up for repairs; the superintendents of three leading ferries in New York harbor having expressed the opinion, and the reasons of it with an exhibition of estimates, that the boat was worth that much per day; though it was admitted by her owners that there was no fixed charter rate for ferry-boats.

The Circuit Court affirmed the decree, and from this the present appeal came.

Assuming the case as above given to be the case made out

by the evidence (which was what the court did assume), the points, of course, were:

1st. Which boat had violated the rules of navigation?

2d. Whether the decree for demurrage was rightly made on the testimony, and with the admitted want of evidence of a *charter rate* per day for ferry-boats; and when the company supplied the place of the injured boat with another boat of their own, kept for emergencies of a sort such as that which had happened.

*Mr. C. Van Santvoord, for the appellants; Mr. W. J. A. Fuller, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Collision cases usually present difficult questions of fact, arising from conflicting testimony, and the case before the court is one of that class, but both of the subordinate courts decided in favor of the libellants, and our decision, with brief explanations, must be in the same way.

The libellants are the owners of the steam ferry-boat James Watt, employed in transporting passengers and freight between the port of New York and the city of Hoboken, in the State of New Jersey, and they filed the libel in the District Court against the steamtug Cayuga, usually employed in towing vessels and other water-craft, charging that the steamtug was so improperly and unskilfully managed and navigated that she ran into and upon the James Watt, causing to the latter steamboat great injury and damage, as more fully set forth in the libel. By the pleadings and evidence it appears that the collision occurred at four o'clock in the afternoon of the thirteenth of June, 1866, in clear weather and under circumstances which show beyond all doubt that one or both vessels were in fault. Daily trips were made by the James Watt, and at the time she was making her regular trip down the river to her place of destination at the foot of Barclay Street, on the New York side of the river. She started from her regular slip at Hoboken, and as she proceeded on her route she was heading obliquely across the

river towards the wharf to which she was bound. Shortly after the James Watt left her wharf at Hoboken the Cayuga came out from the slip at the foot of Desbrosses Street, and having rounded to, nearly opposite Hubert Street, she then took a course down the river, heading for the Jersey side of the river, though less obliquely than the ferry-boat of the libellants, and they collided when the former had advanced about one-third of the way across the river towards the Jersey shore. Enough appears to show that the James Watt was heading in a south by east course, and that she was running in the track she usually followed in making her daily trips, and that the Cayuga was heading nearly in a south-southwest course for the place of her ultimate destination on the opposite side of the river. Both steamers were well manned, and each was seasonably seen from the other and at about the same time, and as it was daylight and good weather, and as it was obvious that their courses intersected, it must have been known to those intrusted with their navigation that a collision might ensue unless some proper precaution was seasonably adopted to prevent such a disaster. They had plenty of sea-room, and if either had changed her helm the collision would have been prevented, but as the Cayuga had the James Watt on her own starboard side throughout, from the time she took her course down the river to the time of the disaster, the sailing rules made it her duty to keep out of the way. Article fourteen prescribes that "if two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other," and the court is of the opinion that the Circuit judge was correct in deciding that that rule is applicable in this case.

Suggestion is made, and perhaps it is correct, that the Cayuga was slightly ahead when she first took her course and started down the river, but the speed of the James Watt being somewhat the greater it appears that she soon made such an advance that it became evident that unless one or the other gave way the danger of collision would become imminent. Apply that rule and it is clear that it was the

duty of the Cayuga to keep out of the way, inasmuch as she had the James Watt on her own starboard side. Every vessel overtaking another vessel, it is said, shall keep out of the way of the vessel ahead, but that rule cannot properly be applied in this case, as the two steamers were crossing or running on intersecting lines, in which case the question is not in general affected by the comparative speed of the two vessels, nor by the fact that the one or the other was slightly ahead when the necessity for precaution commenced.

Undoubtedly where two ships are running in the same direction, the ship astern, if she is sailing faster than the ship ahead, is in general bound to adopt the necessary precautions to avoid a collision, but it is clear that the rule does not in general apply in a case where the ships are crossing or are distant from each other on a right line and are running on intersecting lines, as it is expressly enacted where two steamships are crossing that the ship which has the other on her own starboard side shall keep out of the way of the other.*  Such is the express regulation enacted by Congress, and the correlative duty of the other vessel is described in the eighteenth article, which is, that where one of two ships is required to keep out of the way the other shall keep her course, subject to the qualifications contained in the succeeding article, which is entitled a "proviso to save special cases." By that proviso it is prescribed that in obeying and construing those rules due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from those rules necessary in order to avoid immediate danger.† Persons engaged in navigating vessels upon the seas are bound to observe the nautical rules enacted by Congress, whenever they apply, and in other cases to be governed by the rules recognized and approved by the courts. Nautical rules, however, were framed and are administered to prevent such disasters and to afford security to life and property, but

---

* Whitridge v. Dill, 23 Howard, 453.
† 13 Stat. at Large, 60, 61.

it is a mistake to suppose that either the act of Congress, or
the decisions of the courts, require the observance of any
given rule in a case where it clearly appears that the rule
cannot be followed without defeating the end for which it
was prescribed or without producing the mischief which it
was intended to avert.   Qualifications of that character were
sanctioned by this court years before the existing rules were
enacted by Congress, and no doubt is entertained that the
proviso to save special cases contained in those rules was in-
tended to affirm in substance and effect the views upon that
subject which this court had previously expressed.*   Respon-
sive to the charge that the Cayuga did not observe the four-
teenth article of the sailing rules, the respondents attempt
to show that the James Watt did not keep her course, as
required by the eighteenth article—that she was running
faster than the steamtug, and that having passed her on the
starboard side she suddenly sheered across her bows, and
that the two steamboats in a few seconds came together, the
stern of the Cayuga striking against the port stern-quarter
of the James Watt and caused the injuries alleged in the
libel.   Instead of that the District Court found, as matter
of fact, that the Cayuga, just before she reached the point
of intersection, stopped her engine, giving those in charge
of the ferry-boat to understand that the latter steamer could
pass in safety, which had the effect to mislead those in charge
of the James Watt, as the Cayuga in a brief period put her
engine in motion and started ahead, and that the collision
immediately ensued.

Additional testimony was taken, subsequent to the appeal
from the decree of the District Court, but the Circuit Court,
in view of the whole case, was still inclined to the opinion
that the finding of the District judge was correct.   Consid-
erable conflict exists in the testimony on that point, but it
is not necessary to decide it, as the same conclusion must be
adopted even if it be admitted that the steamtug did not
stop her engine and mislead the ferry-boat, as is supposed

---

* Steamship Co. v. Rumball, 21 Howard; 385.

by the libellants, as it is clear that the charge made against the James Watt that she changed her course is not sustained.

Even if the Cayuga did not do anything to mislead the James Watt it is clear that she did not keep out of the way, as required by the fourteenth sailing rule, nor did she adopt any proper precaution to prevent a collision. Bound as she was to keep out of the way, the fact that she did not comply with that requirement is as complete an answer to the defence set up by the claimants as the proof would be that she misled the other vessel, as charged by the libellants. Having done nothing to prevent the collision she must abide the consequences, unless she can show some good reason for her failure to perform her duty in that regard. All the excuse, or the principal one, offered is the one before mentioned, that she was ahead and that it was the duty of the James Watt to have adopted the necessary precautions.

Where a steamer astern, in an open sea and in good weather, is pursuing the same general course as the one ahead, and at greater speed, the steamer astern, as a general rule, is required to give way or to adopt the necessary precautions to prevent a collision, as the steamer ahead is entitled to the road, but the court here concurs with the Circuit Court that that rule did not apply in this case, even if it be conceded that the Cayuga, after she rounded to, and when she first took her course down the river, was slightly ahead, as the relative situation of the two steamers even at that time, was that described in the fourteenth article of the sailing rules, and not that described in the seventeenth article, as is supposed by the respondents. Precautions at that time were not necessary, as the distance between the two steamers, measuring east and west, was very considerable, but they were running on converging lines, and as they advanced that distance was fast reduced, which soon created the necessity for precautions to prevent a collision, and the testimony entirely satisfies the court that at the time the necessity for precaution commenced, the two steamers were nearly abreast, and that the Circuit Court was right in holding that the fourteenth sailing rule is applicable to the case,

and that it was the duty of the Cayuga to keep out of the way.

Reference was made to a commissioner in the District Court to ascertain the amount of the damages, and he reported the whole amount to be two thousand six hundred and seventy-two dollars and thirty cents, as more fully shown in the record. Exceptions were duly taken by the respondents to various items of the report, but the court overruled the exceptions and confirmed the report. In cluded in the report of the commissioner was an allowance of seventy-five dollars per day for the seventeen days the steamer was detained while the repairs were being made, and to that allowance the respondents still object. Other exceptions to the commissioner's report were taken at the time, but they have not been much pressed in argument and are overruled as not well founded. Reasonable demurrage is certainly a proper charge, as the leading maxim is *restitutio in integram* in all suits for damages occasioned to vessels by collision.* Subject to the provision that owners of ships and vessels are not now liable for any such loss, damage, or injury, beyond the amount of their interest in the ship and her freight then pending, it is settled law that the damages which the owner of the injured vessel is entitled to recover in cases of collision are to be estimated in the same manner as in other suits of like nature for injuries to personal property, and the owner, as the suffering party, is not limited to compensation for the immediate effects of the injury inflicted, but the claim for compensation may extend to loss of freight, necessary expenses incurred in making repairs, and unavoidable detention.† Tested by that rule it is quite clear that the explanations given by the respective judges in the subordinate courts are sufficient to show that the report of the commissioner was correct. Many other authorities might be referred to in support of the rule here laid down,

---

* The Baltimore, 8 Wallace, 385.

† The Cayuga, 2 Benedict, 125; S. C., 7 Blatchford, 389; S. C., 1 Benedict, 171.

but inasmuch as the subject was fully considered in the case of *The Baltimore*, the court does not deem it necessary to give it much additional consideration.

DECREE AFFIRMED.