### THE STATE OF TEXAS.

*(District Court, S. D. New York.   April 29, 1884.)*

**1. COLLISION—TURNING IN THE EAST RIVER—LOOKOUT—OVERTAKING VESSEL.**
  A steamer in the East river, having upon her own starboard hand another large steamer, evidently engaged in turning around in a way that must cross the course of the former, is bound to keep out of her way, and give room for her necessary path in turning. When that duty has attached, she cannot relieve herself of it by getting across the bows of the latter and claiming that the latter is then in the position of a following or overtaking vessel.

**2. SAME—CASE STATED.**
  A large steamer, engaged in making a turn in the East river, is bound to special watchfulness and care to avoid contact with other vessels. The lookout having failed to continue his attention to a tug and tow on the opposite side of the river, and a collision having happened, which, by such attention, would have been avoided by the steamer's timely backing, *held*, that both were in fault,—the steamer for inattention, and the tug for steering across the steamer's path, instead of stopping, as she might have done.

The libel in this case was filed by the owners of the schooner Knight, to recover damages for a collision with the steam-ship State of Texas, on the twenty-first of March, 1882, about 7 A. M., near the middle of the East river, a short distance above the Brooklyn bridge. The schooner was in tow of the steam-tug Unit, on a hawser from 30 to 35 fathoms long. They were going from Wallabout down the East river, and, until coming near the bridge, had been going within a few rods of the Brooklyn shore, with the tide strong flood. The top of the mizzen-mast, including the flag-staff, was about 125 feet from the water, requiring her to pass nearly under the center of the bridge, and it was while going from her previous position near the shore, across, to pass near the center of the bridge, that the collision happened.

The state of Texas is a steamer of about 1,800 tons register, and 249 feet long. She had come in from sea that morning, bound for pier 20, East river, which is below the bridge; but she was prevented from landing there through the presence of another schooner, which was in the way. She accordingly drifted up, moving slowly, and gradually turning under a hard a-port wheel, designing to make a landing at the pier by returning heading against the tide. In making this turn, and going back and forth in the process, she drifted

somewhat above the bridge. When the schooner and tug were first seen from the State of Texas they were close to the Brooklyn shore, as above stated, while the State of Texas had her stern very near to one of the ferry slips above the bridge, on the New York side, and was pointing nearly across the river, but a little up, in the region of the Empire stores. The steamer moved ahead under a hard a-port wheel, gradually turning downwards. When the tug and schooner were seen coming across the river, the steamer's engines were reversed full speed, but not in time to avoid hitting the starboard bow of the schooner, from which the latter received some injury.

*Owen & Gray*, for libelants.

*Butler, Stillman & Hubbard*, for State of Texas.

*Scudder & Carter* and *Geo. A. Black*, for the Unit.

BROWN, J. The pilot of the Unit saw the State of Texas when her stern was very near the New York shore, a little way above the bridge, when she was headed nearly across the river. He had no right to suppose at that time that she was merely drifting. Any proper observation of her previous movements, which were clearly visible, would have shown that she was engaged in turning round, and the Unit must therefore be held chargeable with knowledge that the steamer was engaged in that maneuver. The pilot of the Unit had the steamer at that time on his own starboard hand. He was bound to anticipate just what happened, that she would move out into the river for the purpose of turning. He was bound to keep out of her necessary way, and to leave her room reasonably sufficient to execute the maneuver in which the steamer was then engaged, precisely as he would have been bound to keep out of the way of a schooner beating downward, which had run out her tack and was in stays in coming about. This he might have done without difficulty or danger, by stopping before approaching the center of the bridge, as the tide was flood. Instead of doing so, he went on with unabated speed, veering to the westward to reach the central portion of the bridge, and while thus passing the necessary path of the steamer in executing her turn, he drew the schooner directly in the way of the steamer's course; and he must, therefore, be held chargeable with fault in bringing about the collision.

The steamer was not in the position of an overtaking vessel bound to keep out of the way; certainly not so before the tug had violated her duty of keeping out of the way of the necessary course of the steamer in making her turn. Where one steamer is bound to keep out of the way of another on her starboard hand, their courses being intersecting, she certainly does not relieve herself of that duty by crossing the path and getting under the bows of the latter. She cannot plead her own fault as a justification, and claim that the vessel thus wrongfully brought on the quarter or astern, is in the situation of an overtaking vessel, and thus reverse the original obligation on her own part to keep out of the way. If the courses are intersecting,

the rule is the same, though she be a little ahead. *The Cayuga*, 14 Wall. 270, 275. The steamer in this case was not two points aft of abeam, but on the Unit's starboard hand, when the latter began her sheer; and hence the steamer was not a following or overtaking vessel. *The Franconia*, 2 Prob. Div. 8; *The Cayuga, supra*. There was danger of collision from the very act of sheering to the westward, and the Unit was therefore bound to refrain from such a change. *The Nichols*, 7 Wall. 656; *The Free State*, 91 U. S. 200.

But the State of Texas cannot be excused from fault. The navigation of the steam-tug with the schooner upon a hawser, from the moment when they were first seen near the Brooklyn shore, was such as to require special watchfulness to avoid a collision. The high masts of the schooner evidently required her to approach the center of the bridge, if she continued on. The turning, moreover, of a steamer of such size as the State of Texas in so narrow a place as the vicinity of the bridge, required careful and continuous watchfulness. While the difficulties of handling the steamer are fully recognized, and while I am satisfied that the captain did the best he could, I think the testimony shows clearly that the lookout on the steamer was not as attentive to the course of the tug and tow, after he had first seen them, as the situation required. The evidence shows that after seeing them first, near the Brooklyn shore, he did not suppose they required particular attention; and that he did not observe them again until some little time after, when the tug was already crossing the steamer's path. Had the tug been noticed, as she ought to have been, when she commenced her sheer to the westward, there would not have been any difficulty in the steamer's reversing in time to prevent the collision. She was not noticed until too late, although the steamer's engines were put full speed astern. The previous fault of the tug did not relieve the steamer of her duty to keep constant watch for the purpose of avoiding injury. *The Maria Martin*, 12 Wall 31; *The Vim*, 12 FED. REP. 906; *The Pegasus*, 19 FED. REP. 46. In this respect I must hold the steamer also liable, and award a decree against both in favor of the libelant, with costs.