New York Harbor Towboat Company, Respondent, *v.* New York, Lake Erie and Western Railroad Company, Appellant.

1. Shipping — Navigation — Contributory Negligence. Where the undisputed evidence in an action to recover damages sustained through a collision between two steam vessels belonging to the parties respectively, shows that the plaintiff failed to comply with a rule of navigation (U. S. Rev. Stat. § 4233, rule 21) applicable to the situation of the vessels immediately preceding the collision, and which required him to "slacken her speed, or, if necessary, stop and reverse" his vessel, he is guilty of contributory negligence as matter of law, and the submission of the question to the jury is reversible error.

2. Maritime Tort — Damages. Where an action at law is brought for a maritime tort, the admiralty rule of an equal division of damages, where both vessels are at fault, does not prevail, but the general rule is that neither can recover.

*N. Y. H. T. B. Co.* v. *N. Y., L. E. & W. R. R. Co.* (76 Hun, 258), reversed.

(Argued January 29, 1896; decided February 25, 1896.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made March 9, 1894, which affirmed a judgment in favor of plaintiff entered upon a verdict, and also affirmed an order denying a motion for a new trial.

This action was commenced on the 12th of March, 1885, but was not brought to trial until October 24th, 1892.

The plaintiff sued to recover damages alleged to have been sustained in a collision which occurred in the North river, off the Chambers street ferry, New York, on the 27th day of October, 1884, at about seven o'clock in the morning, between the plaintiff's steamboat, *J. G. Emmons*, and the defendant's ferryboat, *Pavonia*.

The facts, so far as material, are stated in the opinion.

*George Bethune Adams* for appellant. The complaint should have been dismissed, as when the *Emmons* failed to get an answer to her first one-whistle signal she should have stopped and reversed at once. (U. S. R. S. § 4233; *The Syracuse*, 9 Wall. 676; *The Alaska*, 22 Fed. Rep. 548; *The Galileo*, 24 Fed. Rep. 386; *The City of Albany*, 34 Fed. Rep. 813; *The Columbia*, 23 Blatch. 268, 270; Desty on Ship. & Admy. § 381.)

*Edward H. Hobbs* for respondent. The twenty-first rule of navigation, invoked by the defendant, was not applicable to the situation of the vessels, and consequently its non-observance was not a fault. (*The Blue Jacket*, 144 U. S. 371.)

Bartlett, J. Without reference to the circumstances concerning which the evidence is conflicting, a few of the general and undisputed facts may be stated in order to disclose the situation which resulted in the collision between the plaintiff's steamboat, *Emmons*, and the defendant's ferryboat, *Pavonia*.

The *Pavonia* left her Jersey City slip on the morning of October 27th, 1884, at a few minutes after seven o'clock, bound for Chambers street, New York; it was slack water, with no wind, and she laid her course direct for the New York slip, steering in a southeasterly direction.

The *Emmons* had laid the night before at a pier in the North river, in the vicinity of King street, New York, a considerable distance above the place of collision, and started

down the river for the Battery, at about the same hour the *Pavonia* left Jersey City, taking her course at about three hundred feet outside of the pier heads; when off Harrison street, or a little below it, a short distance north of the ferry slip at Chambers street, the engineer notified the pilot that the vessel needed fresh water, and there being a hydrant at Harrison street, it was decided to return to that place and procure a supply.

The *Emmons*' helm was ported which turned her head off shore and she was kept on the swing with the helm hard-a-port, running at from nine to ten miles an hour until the collision occurred.

It is undoubtedly true that if the *Emmons* had held her course to the Battery she would have passed ahead of the *Pavonia* and there would have been no collision. The accident was due to the maneuver whereby the *Emmons* sought to turn to starboard and return to Harrison street, which she had passed. The conflict in the evidence is in regard to the precise position of the respective vessels just prior to and at the time of the collision and as to which pilot was guilty of negligence.

On the part of the plaintiff it is claimed that the *Emmons* swinging to starboard on a port helm did not at any time cross the course of the *Pavonia* when steering for the New York slip, and that the collision was due wholly to the fact that for some strange and unexplained reason the pilot of the *Pavonia* a few seconds before the collision put the helm to starboard, swung the head of his vessel out of her course and up stream to port, thus coming aboard the *Emmons*, the *Pavonia's* port bow striking the *Emmons*' port wheel.

On the part of the defendant it is contended that the *Emmons* did pass over the *Pavonia's* course, and the pilot of the latter seeing her do so considered her out of the way, ceased to watch her and devoted his attention to making his slip; his attention was recalled to the *Emmons* a few seconds later by one whistle, when he observed she was swinging to starboard and seeking to cross the bow of the *Pavonia;* he

answered the whistle by a single blast, but the collision was so imminent he stopped and reversed the engines keeping his helm amidships; at the moment of the collision the *Pavonia* was under but little headway, and her pilot had done everything that good judgment could dictate acting *in extremis*, in a moment of supreme peril.

If the disposition of this case depended on the verdict of a jury after considering these disputed questions of fact we could not interfere with the judgment entered thereon even if we should have reached a different conclusion than that arrived at by the jury.

We are, however, of opinion that there was no question for the jury, and that on the undisputed facts as disclosed by the plaintiff it was guilty of contributory negligence under the well-settled rules of navigation.

This brings us to consider the situation of the two vessels within less than a minute of the collision when only 800 or 1,000 feet apart and each running at a speed of from nine to ten miles an hour.

We will quote from the brief of the learned counsel for the plaintiff in describing this situation :

" The claim of the plaintiff is that the *Emmons* commenced to turn about when opposite the foot of Harrison street, when the *Pavonia* was beyond the middle of the river; and that she never got below the line connecting the ferry slips ; and that at the time she blew her whistle indicating that she was going to keep to the right, she was 600 feet from the shore, headed northwest, and the ferryboat was 800 to 1,000 feet distant from the *Emmons* headed southeast, and the courses of the two vessels was then ' head and head, or nearly so,' or they were approaching each other in an ' oblique direction.' "

This whistle given by the *Emmons* and referred to by plaintiff's counsel was one blast and was not answered by the *Pavonia*.

The master of the *Emmons* made a report in his own handwriting to the steamboat inspectors, as required by law, on

73

·the day of the collision, in part as follows, viz.: "While we were on the swing I blew one whistle to the *Pavonia*, with no answer. I am positive the ferryboat did not answer my whistle, as I closely watched her and there was not a particle of steam issuing from the whistle pipe, and if there had been a whistle blown I would certainly have heard it as there was no wind to obstruct the sound."

A witness for plaintiff, John W. Thompson, who was in the pilot house of the *Emmons*, corroborates this statement.

This one whistle was the proper signal for the situation under inspectors' rules 1 and 2 which read:

"Rule I. When steamers are approaching each other 'head and head, or nearly so,' it shall be the duty of each steamer to pass to the right, or port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle, and thereupon such steamers shall pass to the right or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head, or nearly so,' the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left, or on the starboard side of each other.

"Rule II. When steamers are approaching each other in an oblique direction (as shown in diagram of the fourth situation), they shall pass to the right of each other, as in meeting 'head and head, or nearly so,' and the signals by whistle shall be given and answered promptly as in that case specified."

The instant the *Pavonia* failed to answer this one blast of the *Emmons*' whistle, it became the imperative duty of the master of the *Emmons*, in view of the situation, to have slackened his speed, or, if necessary, to have stopped and reversed his engines, and to have given several short and

rapid blasts of the steam whistle and taken any and every precaution necessary to prevent a collision.

There are several rules of navigation which apply to this emergency.

The third rule of the board of supervising inspectors of steam vessels is as follows, viz.: "If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered and understood, or until the vessels shall have passed each other."

The twenty-first rule of navigation, in force at that time, provided: "Every steam vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." (U. S. Rev. Stat. § 4233, p. 818.)

That the master of the *Emmons* rested under the obligation of immediate action, as already pointed out, when his whistle was unanswered is supported by abundant authority.

In the case of the *Columbia* (23 Blatchford, 268–270) Judge BLATCHFORD said: "When the *Columbia* received no response to her first signal of one whistle, she ought to have stopped and backed instead of giving her second signal of one whistle. She saw that the *Baxter* was persisting in going on, and was not responding affirmatively by a signal of one whistle, and that there must be a collision if the *Columbia* also kept on. If it was the duty of the *Baxter* primarily to keep out of the way, and the correlative duty of the *Columbia* to keep her course, that duty was imposed on the *Columbia* for the purpose of enabling the *Baxter* to keep out of the way. But it was not permissible for the *Columbia* to persist in going on, under the plea of keeping her course, when she saw that her

signal was not affirmatively responded to by the *Baxter.* On the contrary, under rule 21, of § 4233, there then became risk of collision, and it was the duty of the *Columbia* to 'slacken her speed, or, if necessary, stop and reverse;' and, under rule 24, special circumstances existed which made it necessary for the *Columbia* to stop 'in order to avoid immediate danger.' The fault of the *Baxter* was no excuse for the fault of the *Columbia.* The situation was plain to the *Columbia,* and she was bound to deal with it as it existed, not as it ought to have been. These principles are established by decisions of the Supreme Court (*Chamberlain* v. *Ward,* 21 How. [U. S.] 548, 567, 568; *The Gray Eagle,* 9 Wall. 505, 510·; *The Maria Martin,* 12 Wall. 31, 47; *The Ariadne,* 13 Wall. 475, 479; *The Cayuga,* 14 Wall. 270, 275, 276; *The Continental,* Id. 345, 359; *The Sunnyside,* 91 U. S. 208, 214, 215; *The America,* 92 U. S. 432, 438)."

While the trial court called the attention of the jury to the rules of navigation, it was error not to have held as matter of law on the undisputed evidence that the master of the *Emmons* failed to obey the rules of navigation.

We do not think the fact that the *Emmons* later blew one blast of her whistle a second time and then received a similar whistle from the *Pavonia* in any way relieved her from the failure to take any precautions to prevent the collision under the rules.

The second whistle was given when the vessels were less than five hundred feet apart, and when the speed of each is considered it may well be assumed all action after that was *in extremis.*

It is undisputed that the *Pavonia* came into the collision with her engines reversed.

The contributory negligence of the *Emmons* must be regarded as fully established in this case as a matter of law on undisputed facts.

The view we take of this case renders it unnecessary to consider the right of a ferryboat to an undisturbed passage between its landing places in the performance of a public duty

which secures to it an immunity not accorded to other vessels. (*The Breakwater*, 155 U. S. 253, 262, and cases there cited.)

In an action at common law for a maritime tort the admiralty rule of an equal division of damages where both vessels are at fault does not prevail; but the general rule is that neither can recover for injuries so caused. (*Belden* v. *Chase*, 150 U. S. 674.)

The judgment and order of the General Term should be reversed and a new trial ordered, with costs to appellant to abide the event.

All concur, except ANDREWS, Ch. J., not voting.

Judgment and order reversed.