## THE PRISCILLA.

## MEXICAN PETROLEUM CORPORATION v. DOANE TOWBOAT CO. et al.

## DOANE COMMERCIAL TOWING CO. v. MEXICAN PETROLEUM CORPORATION et al.

### Nos. 2569, 2570.

Circuit Court of Appeals, First Circuit.
Jan. 14, 1932.

Edward S. Dodge, of Boston, Mass., and Nathan W. Thompson, of Portland, Me., for Mexican Petroleum Corporation.

Charles S. Bolster and Seymour P. Edgerton (of Burnham, Bingham, Gould & Murphy), both of Boston, Mass., for Doane Commercial Towing Co.

Otto Wolff, Jr. (of Lewis, Adler & Laws), of Philadelphia, Pa. (Frederick Foster, of Boston, Mass., on the brief), for Atlantic Refining Co.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

BINGHAM, Circuit Judge.

These are cross-appeals from a decree of the District Court for Massachusetts in favor of the libelant, the Mexican Petroleum Corporation, a Maine corporation and the owner of barge No. 2, in a libel in rem brought in its own behalf and in behalf of John S. Depson and Albert H. Johnson, captain and mate of the barge, against the steam tug Priscilla, to recover damages sustained in consequence of a collision with the motor vessel Brilliant, which occurred at about 6:35 on the morning of Monday, March 1, 1926, in the southern draw opening of the Chelsea Bridge, North, on the Mystic river.

The Doane Towboat Company, a Massachusetts corporation (name since changed to the Doane Commercial Towing Company), appeared and filed a claim as owner of the steam tug Priscilla and answered the libel.

It also filed a petition to bring in and implead, under Admiralty Rule 56 (28 USCA § 723), the Atlantic Refining Company, owner of the motor vessel Brilliant. The refining company appeared and answered the petition and libel.

The case was heard in the District Court before Judge Lowell, who on August 4, 1927, delivered an oral opinion in which he found the steam tug Priscilla at fault in going through the southerly draw opening instead of the northerly one, and solely at fault for the collision. He ruled and found that the Mystic river, including the passageways under the Chelsea Bridge, North, was a narrow channel, and further ruled and found that, if it was not a narrow channel, there was no negligence on the part of the Brilliant, and ordered the petition impleading the Atlantic Refining Company, the owner of the Brilliant, dismissed.

Having made this interlocutory decree, he sent the case to an assessor to ascertain the damages suffered by the libelant.

May 26, 1928, the assessor filed his first report. The court allowed certain items of damage found by the assessor, disallowed certain others, and on August 2, 1928, sent the case back to the assessor instructing him to make certain other findings as to damages. December 2, 1929, the assessor filed his second report, and the libelant and the Doane Towboat Company having filed exceptions thereto, the court, after hearing, overruled them. In his final decree he ordered that the assessor's findings, amounting to a total damage of $5,192.71, made up as follows, be allowed the libelant:

| | Items. | Amount. |
|---|---|---|
| Preliminary survey and minor repairs | 1–4 | $94.96 |
| Small furnishings and clothing of crew | 7–12 | 112.95 |
| Atlantic Works, painting bottom | 12 | 130.00 |
| Paint for bottom | 13 | 86.80 |
| Canal tolls | 15 | 120.10 |
| Pilotage | 16 | 32.00 |
| Atlantic Works, contract for repairs of hull of Barge 2 | 21 | 4,000.00 |
| Extra expense of operating Barge 2 in injured condition (revised) | 11 | 27.00 |
| Extra expense in use of tug Pan-Am in towing barge No. 25 from New York and back (revised) | 14 | 588.90 |
| | | $5,192.71 |

—together with interest on said sum from April 15, 1926, until the date of the decree, amounting to $1,428, together with costs of $473.44, or a total of $7,094.15.

He further ordered that the Atlantic Refining Company recover $148.26, costs from the Doane Towboat Company and the Mexican Petroleum Corporation; and that the libelant recover the sum of $7,094.15 against the steam tug Priscilla or her stipulators for value.

He disallowed the assessor's findings composed as follows:

| | Items. | Amount. |
|---|---|---|
| Services of surveyors representing insurance companies at the survey | 5–6 | $125.30 |
| Detention of Barge No. 2 while on Bethlehem dry dock, 1 day | 17 | 140.00 |
| Damage for use of substitute Barge No. 25 and for time spent by her in coming from and returning to New York | 18–20 | 3,046.50 |
| Extra cost of operating Barge No. 2 after collision until she was hauled out for repairs (revised) | 11 | 23.00 |
| Services of Pan-Am in towing Barge No. 25 from New York and back (revised) | | 661.10 |
| | | $3,995.90 |

He also disallowed the assessor's alternative finding of damages due the appellant of $16,558.02.

From this decree both the Mexican Petroleum Corporation and the Doane Commercial Towing Company appealed, each assigning various errors in the rulings and findings of the court with reference to the question of liability and various items of damage allowed and disallowed.

The libelant's barge No. 2 was about 200 feet long and 30 feet beam. She was of steel construction and shaped much as an ordinary boat. She had no means of propulsion, had a fixed rudder, and was moved from place to place, in the prosecution of her occupation, by other vessels. The occupation in which she was engaged at the time of the collision was the supplying of bunker oil to steam vessels and other vessels and structures requiring such oil in Boston Harbor.

On the morning of March 1, 1926, at about 6 o'clock, barge No. 2, while at her berth at Sargent's Wharf in Boston Harbor, was made fast, in the location of her bow, by lines on her port side, to the port side or bow of the steam tug Priscilla owned by the Doane Towboat Company, which was under contract to tow the barge. The Priscilla then proceeded to tow or push Barge 2 stern foremost to the wharf of the Merrimack Chemical Company in Everett to supply oil to the steam ship Patria then lying at that wharf. The barge had a capacity of 8,500 barrels and at this time had on board a cargo of 6,400 barrels of oil and was drawing about 8 feet of water forward and aft. She had a crew of two men. It was good weather and broad daylight. To reach her destination in Everett on the Mystic river, the Priscilla and barge had to pass through the draw of the Chelsea Bridge, North, located at the mouth of the river. The bridge of which the draw was a part provided a highway connecting Chelsea at its northerly end with Charlestown at its southerly end. When the draw was opened it swung on a pivot located on a pier situated at the center of the stream as it passed under the bridge. This pier was 525 feet long and narrow. The distance from its easterly or harbor end to the pivot was 300 feet. The passageways on either side of this pier were each of the width of 125 feet. The highway leading over the bridge at its southerly end and for a long distance south was of such a height as to obstruct the view of vessels coming up the harbor to the draw from the south and of vessels coming down the Mystic river to the draw until they reached the south opening of the draw. The course of the Mystic river above the west entrance to the draw, after rounding a sharp curve, was in a southwesterly direction.

On the morning in question the steam tug Priscilla with the barge, on reaching the drawbridge, entered the southerly passageway and when the stern of the barge had reached or nearly reached the westerly end of the pier, at which time the Priscilla was in the neighborhood of the pivot of the pier, the barge came into collision with the Brilliant which had come down the river and had rounded the curve to enter the south opening. The bow of the Brilliant struck the stern of the barge, then extending out into and partly across the passageway, on the port side.

The Priscilla was 80 feet long, her pilot house was about 15 feet aft of her bow, and the distance from her bow to the stern of barge No. 2 was about 160 feet, making the pilot house about 175 feet back from the stern of the barge. She had no lookout forward of her pilot house nor upon the stern of the barge which she was propelling stern forward. The captain and mate of the Priscilla were in the pilot house.

As the Priscilla and her tow approached the bridge, the Priscilla blew two long and two short blasts, indicating her intention to enter the draw, and received the usual reply from the draw bridge of three whistles. As the Priscilla entered or was about to enter the south passageway at the easterly end of the draw, her master claims to have seen the Brilliant some 600 feet above its westerly end, apparently stopped; he testified that the Priscilla then proceeded to go through the draw, but that, after entering and observing the Brilliant was coming forward, he blew one blast indicating that he was to keep to his starboard; that he then reversed full speed astern, blew three blasts, and afterward blew a danger signal. But the testimony of other witnesses as to what he did, when he signaled, and what signals he gave, after entering the draw, is so conflicting as to render his testimony in these respects of little value. He plainly was in no position before entering the draw to know what distance the Brilliant was from the draw or that she was not coming forward, and by entering it took his chance of a collision, and was at fault irrespective of his violation of the narrow channel rule.

The Brilliant is a motor vessel, an oil tanker, 168 feet long and 31 feet beam. On the morning of the accident at about 6:15 she left the dock of the Beacon Oil Company, located about three-fourths of a mile above the Chelsea Bridge. She was an electric driven vessel having a Diesel engine. Her course and speed were controlled by her master, who, at this time, was stationed on her bridge piloting her. Her second officer was also on the bridge, which was 125 feet from her stem. The second officer was doing the steering. There was evidence on the part of the Brilliant that her first officer was on the forecastle head as a lookout; but no one else who observed her coming down that morning saw any lookout upon her. Her evidence also was that as she reached a point opposite the southerly passageway the Priscilla and her tow were seen some distance below the easterly end of the draw and that her officers were then unable to determine through which side of the draw opening the Priscilla was intending to go. The evidence of her officers is that when they observed this, they were approaching the southerly passage-

way in the draw and were but a short distance therefrom; that later, observing that the Priscilla and barge had entered the southerly passageway, they reversed their engines full speed astern and threw out their anchor to stop any movement forward; but that the Priscilla and her barge came forward and struck the bow of the Brilliant, which had then stopped.

The testimony of all the witnesses with relation to the distance the Brilliant was from the west end of the draw, at the time the Priscilla and barge had entered the southerly passageway, was a matter of estimation and they were so at variance with one another that no reasonable conclusion can be drawn from it. It cannot be determined therefrom with any certainty that thereafter the Brilliant reasonably could have stopped and avoided the accident and was at fault in not doing so. The distance from the wharf of the Beacon Oil Company, from which the Brilliant came, to the draw was three-quarters of a mile. She turned around and made that distance in twenty minutes, or at about two miles an hour. This surely was not at an immoderate speed, and Captain Larson of the Priscilla testified that the Brilliant as she approached the draw "came ahead slowly."

Furthermore, if the Mystic river, including the draw, was a narrow channel within the meaning of article 25 of the Inland Rules (33 USCA § 210), then it is practically certain, as the trial judge found, that the Priscilla was at fault in going to port and into the southerly passageway through the draw.

Article 25 provides:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The evidence shows that it would have been safe and practicable for the Priscilla to have kept to that section of the fairway which lay on her starboard side. It may have been a little more convenient for her to have taken and passed through the southerly section as she undertook to do. But it was manifestly unsafe and it turned out to be impracticable, as the outcome in this case discloses.

The narrow channel rule applies and has been applied to rivers such as the one here in question. The Alfred W. Booth (D. C.) 127 F. 453. The Mystic for at least a full nautical mile above the Chelsea Bridge,

North, is a straight and comparatively narrow stream with only such piers or wharves as are along its bank on the Charlestown side. It surely does not present such a situation as is disclosed in The Islander (C. C. A.) 152 F. 385, 386, in regard to the North River from the Upper Bay to Twenty-Third street, New York, in which case it was held that the narrow channel rule did not apply as the North River, in that locality, was "traversed continually by vessels of every type proceeding in every conceivable direction," due to the fact that the shores on each side are fully built up and studded with piers and wharves. See, also, The Number 4 (C. C. A.) 161 F. 847.

We think the Mystic river is a narrow channel within the meaning of the rule and that the District Court did not err in so ruling.

Nor do we regard the southern portion of the fairway under the bridge as a separate narrow channel. To so hold would be to subvert the rule and to make it a source of danger rather than a provision of safety. Neither passway was sufficiently wide for vessels safely to pass one another therein; and this was especially true in this case where there were three vessels and the stern of the barge extended out into the fairway as it did.

The Priscilla contends that it was the custom for boats going up the river to take the southerly course. But the infringement of article 25 in such a place as this cannot be controlled by any alleged custom. The Alfred W. Booth (D. C.) 127 F. 453; The Georgia (C. C. A.) 18 F.(2d) 743, 744. In the latter case it was held that navigating the East River on the wrong side in violation of a statute was "a fault that custom or even convenience will not excuse."

The master of the Brilliant knew of no such custom and it was not claimed that he did, which goes to show that if article 25 could be subordinated to an alleged custom the rule laid down in that article would be a source of danger and not a guide to safety.

It is claimed, however, that the Brilliant was required by law to have a licensed pilot; that it had none; and that, if it had had one, he would have known of the custom. But it does not follow that if she had had a licensed pilot that he would have known of the alleged custom. Furthermore, the Brilliant was an electrically driven vessel, not a steam vessel or a sailing vessel, and although she was of over 100 gross tons, she was not engaged in carrying freight or passengers

for hire. This being so, sections 224, 364, and 404, tit. 46, U. S. C. (46 USCA §§ 224, 364, 404), do not require that she should have a licensed pilot. The definition of a "steam vessel" in section 1, c. 4, of the Act of June 7, 1897 (30 Stat. 96 [33 USCA § 155]), is only applicable in construing the rules there laid down.

■■ It seems to us that the fault on the part of the Priscilla as herein disclosed was an obvious and inexcusable one, and where such is the case the rule of the Supreme Court is that the evidence to establish the fault of another must be clear and convincing to make out a case for apportionment of the damages. The City of New York, 147 U. S. 72, 75, 13 S. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 70, 71, 15 S. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Munrio (D. C.) 11 F.(2d) 900; The Ambridge (C. C. A.) 42 F.(2d) 971, 976; The Arfeld (D. C.) 42 F.(2d) 745, 748. The Mexican Petroleum Corporation and the Doane Towboat Company are here seeking to establish the fault of the Brilliant for the purpose of apportioning the damages, and we think they have failed to establish such fault by clear and convincing evidence.

In its assignments of error in regard to damage and demurrage the libelant complains that the court erred (1) in disallowing the item of $125.30 for the services of surveyors representing the insurance company; (2) in disallowing the item of $140 for detention of barge No. 2 while on the Bethlehem dry dock one day, allowed by the assessor; and in not allowing it, at least, $150; (3) in not allowing $800 for the detention of barge No. 2 from March 1 to March 15, inclusive, during which time she was operating in a damaged condition, and only allowing therefor $27 as extra cost of operating her during that time; (4) in disallowing the item of $3,046.50—damage for the use of barge No. 25 during sixteen days she was substituted for barge No. 2, and the 93 hours and 50 minutes she spent in coming from and returning to New York, and 44½ hours she spent at Chelsea for the weather to clear, allowed by the assessor in his first report—and in not allowing therefor a greater sum; (5) in disallowing the item of $1,250 for services of the tug Pan-Am in towing barge No. 25 from New York and back, including the time the Pan-Am lost at Chelsea, allowed in the assessor's first report, and allowing, instead thereof, as ex-

tra expense for the use of the Pan-Am, only $588.90; (6) in not allowing $11,818.01 as the amount of the earnings of barge 25 in Boston while she took the place of No. 2, that being one of the items included in the alternative finding of the assessor of $16,-558.02; (7) in not allowing $4,500 for repairing the damage to barge No. 2, instead of $4,000; and (8) in refusing, on June 27, 1929, to allow the libelant to submit further evidence before the assessor on the question of demurrage, in contravention of his order of August 11, 1928, allowing this to be done.

■ The court did not err in disallowing the $125.30, for services of surveyors representing the insurance company. These two surveyors in making the survey rendered service to the insurance company and not to the libelant. The libelant paid them nothing and incurred no expense on that account.

■ Neither did it err in disallowing the $140, for detention of barge No. 2 while on the Bethlehem dry dock for one day, March 4. The evidence showed that during the period from March 1 to the end of March 15, 1926, barge No. 2 rendered all the service which the libelant had to perform in Boston Harbor during that period; that it suffered a slight extra expense during this time in the way of extra loading and extra towing, for which she was compensated in the final decree by the award of $27.

■ The same is true as to the matter alleged in assignment No. 3. The item of $800 there referred to is the damage claimed to have been suffered from the 1st to the 15th of March by reason of the reduced capacity of Barge 2 to carry, in its damaged state, the number of barrels of oil which it otherwise would. But the evidence, as above pointed out in regard to assignment No. 2, was that during this time barge No. 2 was able to render all the service the libelant required to have rendered in carrying on its business in Boston Harbor. This item was properly disallowed.

■ The item of $3,046.50, referred to in the fourth assignment as allowed by the assessor and disallowed by the court, presents a question as to which the parties seem to be particularly at variance. The District Court disposed of the question upon the ground that the evidence in the case disclosed "the fact that the libelant delivered all the oil which it had contracted to deliver, or had a chance to deliver, during the entire time while barge No. 2 was in operation, and while she was being repaired"; that "there was no

direct damage, therefore, to the libelant, and it is entitled only to any necessary additional expenses, and to the loss of profits which it would have earned, but for the injury to the barge." And from the fact that the libelant delivered all the oil which it contracted to deliver or had a chance to deliver during the time while barge No. 2 was being repaired, the court assumed or inferred that barge No. 25, which was brought over from New York and substituted for barge No. 2 while she was being repaired, would have been an idle boat in New York, and that the libelant, having brought an idle boat to Boston and substituted her for No. 2, suffered no damage or loss of profits by the use of the substitute.

The difficulty with this assumption or inference is that the supposed fact or premise, as stated by the court, is broader in its scope than the evidence warrants. The premise from which the assumption or inference was made, would give one to understand that the libelant (which did business in New York Harbor as well as in Boston Harbor in the delivery of oil to steamers), after barge No. 25 was substituted for barge No. 2 in Boston, delivered all the oil which it had contracted to deliver or had a chance to deliver in New York as well as in Boston. But the evidence was of a more limited character and was, that the libelant was able to deliver all the oil which it had contracted to deliver or had a chance to deliver during this period in Boston Harbor. There was no evidence that it was able to meet its business requirements in New York during this period of substitution. The assumption or inference of the court that barge No. 25 would have been an idle boat had she remained in New York during the period of substitution, and that the libelant lost no profits by her substituted use in Boston, is therefore without any basis in fact and cannot be supported.

While there was no evidence that barge No. 25 would have been idle in New York during her period of substitution, there was positive evidence, given by the president of the Seaboard Shipping Corporation, engaged in the transportation of oil in bulk in New York Harbor, that there was "no surplus of equipment in New York Harbor" of oil barges; and that the demand "in New York Harbor for oil barges was high." The libelee introduced no evidence to contradict this testimony. The fair inference, therefore, is that barge No. 25, if left in New York during the period of substitution, would not have been an idle boat, but a busy one.

The evidence further shows that barge No. 2 only delivered oil to vessels in Boston Harbor; that after it became disabled and was hauled out for repairs, the libelant could not find a substitute in Boston Harbor to take its place, unless it was for a day or two, and for that length of time only at the rate of $192 a day; and, as it needed a barge for a longer period, it finally arranged to have barge No. 25 sent over from its fleet in New York. In New York it had a fleet of five barges (including No. 25) of the unpropelled type, and three of the steam propelled type, for supplying bunker oil to vessels; and one gasoline barge of the unpropelled type. It also had two steam driven tugboats one of which was the Pan-Am; and all the vessels were engaged in the business of delivering oil to boats in that harbor. The vessels represented a large investment of the libelant in the delivery of oil in that harbor, where the evidence shows the demand for such vessels was high and where there was no surplus equipment of oil barges.

In such a situation it cannot be assumed or inferred that barge No. 25 would have been an idle boat in New York Harbor had it not been brought to Boston. While the burden was on the libelant to show it was reasonably probable that barge No. 25 would have been productively employed in New York had she not been substituted for No. 2, we think the evidence justified such a finding and we so find.

[14] The evidence further shows that the services (rental hire) of a barge, in Boston Harbor, similar to barge No. 2, if one could have been procured there, were, after deducting the wages of two men, reasonably worth $165 a day, for as long a period as two weeks or thirty days; and that, in New York Harbor, the services (rental hire) of such a barge were reasonably worth for such a length of time, after deducting the wages of two men, $140 a day.

The facts in this case are even stronger and more favorable to the claim of the libelant than were those in The Emma Kate Ross, 50 F. 845, decided by the Circuit Court of Appeals in the Third Circuit. The facts in that case, in relation to this question, are fully set out in the findings of fact of the Circuit Court, 46 F. 872, 873, subdivision 6, as follows:

"The necessary repairs to the Crystal Stream cost the sum of $2,682.41, and while undergoing repairs she was necessarily delayed 21 days. She was used by the libelant in the excursion business, and every day but

one during the time she was undergoing repairs she was under charter. To fulfill her contracts the libelant used in place of the injured vessel other steamers which the libelant owned, except on eight days, when the libelant hired the steamer Moran. The net value of the charters of the Crystal Stream on the days when her contracts were filled by other boats of the libelant was $1,776.48. The amount paid for the Moran when she was substituted for the Crystal Stream was $880."

In discussing this question the Court of Appeals, at page 847 of 50 F., said:

"The libelants are entitled to the cost of a proper substitute for the whole period, and no more; and there is no just reason why they should receive a higher rate for their own substituted vessel than was paid for the other. The fact that a substitute was procured for part of the time at $110 per day justifies an inference that this was the market value of the services, and that this vessel or another could have been obtained at that rate for the entire period. The Moran was chartered for 10 days, though substituted but for 8. It is of no importance that the libelant's own substituted vessel was larger. The Moran was large enough, there is no evidence, nor suggestion, that she was not fully competent for the service. Presumably the libelants substituted their own vessel because it was more advantageous to themselves than to hire another.

"The libelants cite The Cayuga, 14 Wall. 270 [20 L. Ed. 828], and The Favorita, 18 Wall. 603 [21 L. Ed. 856], where the owners of injured vessels substituted others belonging to themselves, and were awarded the amount of the formers' charters. If these cases support the contention here, the libelants have done themselves injustice in not claiming this measure of compensation for the entire period of 20 days; for if it is applicable at all under the facts it is necessarily applicable to the whole period. The cases, however, do not support the position. The question was not before the court. The libelants there, as stated, substituted their own vessels throughout the period of detention. There was no hiring, or other evidence of the market value of substitutes. Under such circumstances the inference was probably justifiable that the market value of the vessels used was equal to the value of the others' charters. This seems to have been taken for granted. The subject was not considered or alluded to. The only question raised was whether the libelants were entitled to receive any compensation for the vessels substituted,—as they would otherwise have been idle. This question was decided against the respondents.

"Notwithstanding the decision, the respondents here, again present the question, contending, for the same reason, that the libelants should receive nothing for the 12 days during which their own vessel was substituted. Whatever we might think of this question if it was open, we are bound by the decision. It is not, however, improper to say that we think the decision is right. *The libelants were entitled to the market value of the services rendered by their substitutes,—regardless of the fact that they might otherwise have been idle.* The vessels represented a large investment made in preparation for contingencies which might require their services. Why then should the respondents have their use without paying for it? As the court said in The Cayuga, 7 Blatchf. 390 [Fed. Cas. No. 2537]:

"'There is neither justice nor equity in allowing a tort-feasor the benefit of this outlay, gratuitously. Conceding that a just allowance for the necessary cost of another vessel, hired at a fair value, to perform the services is necessary to indemnify the libelants, there is no ground for withholding such allowance when the libelants themselves furnish the substitute.'

"We do not see any force in the suggestion that the decision applies to ferryboats only, and that a distinction should be drawn between such vessels and those employed on excursions and other similar services, where substitution is practicable. We are unable to see any reason for such a distinction, and no suggestion of it is found in the cases."

In that case it was assumed that the vessel substituted by the libelants from their own vessels "might otherwise have been idle" if it had not been substituted, but, nevertheless, it was held that "the libelants were entitled to the market value of the services rendered" by the substitute, thereby indicating that, in the absence of evidence warranting an express finding that the substituted vessel would have been idle, the libelants could recover the market value of her services.

The reasoning advanced in the opinion in The Emma Kate Ross is in accordance with the opinions of the Supreme Court and governs our decision in this case (The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937, and cases there cited), and we think that the libelant, by its evidence, made out a prima facie case as to this element of damage and

rendered it incumbent on the libelees to go forward with proof and show that barge No. 25, during the period of substitution, would, in fact, have been an idle boat. This they failed to do. See The State of California (C. C. A.) 54 F. 404.

In the Winfield S. Cahill (C. C. A.) 258 F. 318, the owner of the Seguranca, the damaged vessel, was blacklisted during the war and could not engage its vessels in trade, and the court held that, during the three days she was undergoing repairs and while her owner was blacklisted, her owner was not entitled to damages for loss of use. That case is not in conflict with the conclusion we reach, but supports it.

The District Court erred in rejecting the item of $3,046.50, which the assessor allowed as loss, for the use of barge No. 25 at the rate of $140 a day for the period specified in the fourth assignment above stated.

■ It also erred in disallowing the item of $1,250 referred to in the fifth assignment for services of the tug Pan-Am in towing barge No. 25 from New York to Boston and back, including the time she lost at Chelsea due to weather. What was said in regard to the preceding item applies with equal force to this one. As to the Pan-Am, however, the evidence is stronger than it was in the case of barge No. 25, for, at the second hearing before the assessor, the libelant introduced further evidence showing that the Pan-Am would have been employed in New York, during the time she was taking barge No. 25 to Boston and return, and that other tugs had to be employed there in her place; although the assessor, under the direction of the district judge, refused to receive such evidence in relation to barge No. 25, which the libelant was ready and offered to submit. This item of $1,250 should be substituted in the decree for the item of $588.90. The latter item should be struck out.

■ The item of $11,818.01 referred to in the sixth assignment was properly disallowed. It does not represent the earning capacity of barge No. 25 in the delivery of oil to boats in Boston Harbor. It is the profit which the libelant actually received from the sale of oil that was so delivered in the month of March by barge No. 25.

■ The matter referred to in the seventh assignment is this: The libelant, before the assessor and the District Court, sought to recover as damages the sum of $4,500 for repairs to barge No. 2. The assessor allowed the sum of $4,000 and, notwithstanding the

libelant's exception thereto, the District Court affirmed this allowance. The evidence was that, after barge No. 2 was damaged in the collision, the libelant obtained bids from different sources to make the necessary repairs; that The Atlantic Works made the lowest bid of $4,500 and obtained the contract to do the work for that sum; and that, when the work was completed, the libelant paid that sum therefor. The contract for the work stipulated that for every day over ten days consumed in making the repairs The Atlantic Works should forfeit $100 a day. Five days over the ten were necessary to complete the work. Upon obtaining the contract The Atlantic Works immediately set about making the repairs, working days, nights and Sundays, but, notwithstanding this, found a longer period than the ten days necessary to do the work. Under these circumstances the libelant did not enforce the forfeiture but paid the full amount called for by the contract, which was a reasonable sum for the work. Although the barge was damaged to the extent of $4,500 and the libelant actually paid that sum to restore it to the condition in which it was before it was damaged through the libelee's fault, the libelee insisted that $500 should be deducted and only $4,000 allowed.

We are, however, of the opinion that the libelee, having damaged the libelant's barge to the extent of $4,500 through its tort, is not in a position to complain because the libelant did not demand of The Atlantic Works the pound of flesh, which it might have done, but paid the bill which represented the reasonable value of the repairs necessitated by the libelee's wrong. Five hundred dollars should be added to the $4,000 item in the decree.

■ The libelant complains that the District Court erred in awarding costs to The Atlantic Refining Company against it and the Doane Towboat Company. After the Atlantic Refining Company was impleaded and filed its answer, it stood, with reference to the libelant, as though it had been made a party defendant in the original libel. Admiralty Rule 56; Eastern Massachusetts Street Railway Co. v. Transmarine Corporation (C. C. A.) 42 F.(2d) 58, 63. The costs were properly allowed.

In view of what has been said, the decree of the District Court, so far as it relates to the question of liability and costs awarded the Atlantic Refining Company, must be affirmed; and, so far as it relates to the question of damage or demurrage, it

must be affirmed except in the particulars above pointed out.

The decree of the District Court is affirmed as to questions of liability and costs; as to the questions of damage or demurrage it is affirmed in part and vacated in part, and the case is remanded to that court for further proceedings not inconsistent with this opinion, together with interest on all amounts awarded to the Mexican Petroleum Corporation, whether by the District Court, or by this court on appeal, with costs in this court to the Mexican Petroleum Corporation against the Doane Commercial Towing Company. The Atlantic Refining Company is allowed costs in this court as in the court below.